**SANDY RIVER NURSING CARE, et al., Plaintiffs, Appellants,**

**v.**

**AETNA CASUALTY, et al., Defendants, Appellees.**

**No. 92–1856.**

United States Court of Appeals, First Circuit.

Heard Dec. 9, 1992.
Decided Feb. 25, 1993.

■

K. Craig Wildfang with whom Wood R. Foster, Jr., Anne K. Weinhardt, Minneapolis, MN, Sidney St. F. Thaxter, John D. Gleason, Portland, ME, Vance K. Opperman, Robert J. Schmit, Minneapolis, MN, Patrick N. McTeague, Topsham, ME, and Barnet D. Skolnik, Portland, ME, were on brief, for plaintiffs, appellants.

Richard G. Parker, Washington, DC, with whom Paul W. Chaiken, Bangor, ME, James E. Kaplan, Bath, ME, Mark F. Horning, Washington, DC, Paul Macri, Lewiston, ME, Fredric W. Yerman, New York City, Michael L. McCluggage, Chicago, IL, Harold J. Friedman, Portland, ME, Carl F. Rella, Bangor, ME, Stanley B. Block, Chicago, IL, Robert S. Frank, Robert F. Hanson, Portland, ME, William A. Montgomery, Deerfield, IL, Michael A. Nelson, Portland, ME, James van R. Springer, Washington, DC, George Z. Singal, Bangor, ME, Joseph E. Coughlin, Chicago, IL, Paul H. Friedman, Washington, DC, Randall B. Weill, Portland, ME, Alfred C. Frawley, Lewiston, ME, Peter J. Rubin, Portland, ME, Lewis V. Vafiades, Bangor, ME, and Lewis A. Noonberg, Washington, DC, were on brief, for defendants, appellees.

Stephen L. Wessler, Deputy Atty. Gen., Francis E. Ackerman, Asst. Atty. Gen., and Thomas D. Warren, Deputy Atty. Gen., on brief for the State of Me., amicus curiae.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

COFFIN, Senior Circuit Judge.

Plaintiffs are a group of Maine employers who claim that the defendant insurance companies illegally conspired to fix prices and conduct a boycott in a successful effort to coerce the state legislature into permitting higher rates for workers' compensation insurance.[1] The district court granted summary judgment for defendants based on the doctrines established in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).[2] 798 F.Supp. 810. The court concluded that plaintiffs' claimed damage—the additional cost of their insurance—was attributable to the legislation rather than to the alleged conspiracy, and that, consequently, federal antitrust laws provide no relief.

On appeal, plaintiffs contend that the court erred both in construing their claims and in immunizing defendants' actions. After carefully reviewing the record and pertinent caselaw, we conclude that the district court properly granted summary judgment for defendants. Although we depart somewhat from the court's analysis— finding that the alleged conspiracy constituted a *per se* violation of the Sherman Act, 15 U.S.C. § 1—we affirm the court's holding that the *Parker* doctrine bars plaintiffs' requested relief.[3]

### I.[4]

Workers' compensation insurance has long been an extremely sensitive issue in Maine. Regulation is strict. All employers who do not self-insure are required to purchase such insurance. Insurers are "required by Maine Law to charge only those

---

1. Plaintiffs sued fifteen insurance companies and the National Council on Compensation Insurance (NCCI), a voluntary association of insurers that is a state-licensed rating organization.

2. In briefest summary, these doctrines exempt from antitrust liability anticompetitive actions attributable to the state, *Parker*, 317 U.S. at 350–52, 63 S.Ct. at 313–14, and political activity by individuals seeking to influence the passage or enforcement of laws, *Noerr*, 365 U.S. at 136–40, 81 S.Ct. at 528–31.

3. The complaint sought injunctive relief in addition to damages, but neither the district court nor the parties devoted attention to this request. We note only that, in light of our analysis, we see no basis upon which plaintiffs may be awarded injunctive relief.

4. We draw heavily from the district court's well-stated description of the recent history of the Maine workers' compensation system.

rates for workers' compensation insurance which have been filed with, and approved by, the Maine Superintendent of Insurance in conformance with Maine Law." Complt. ¶ 32. The businesses and the insurers both have been dissatisfied with the system.

At least since 1981, NCCI and its members have taken affirmative steps to challenge the allowable rates as unfairly low. They have sought review of the Superintendent's rate decisions in court, see, e.g., National Council on Compensation Ins. v. Superintendent of Ins., 481 A.2d 775 (Me.1984) (affirming Superintendent's disapproval of a requested rate increase of 27.5%; NCCI had claimed that statistical evidence showed that a 110% increase was warranted), and consistently have lobbied for legislation that would reduce statutory benefits and permit insurers to charge higher rates. Neither their litigation nor lobbying proved successful during the period relevant to this litigation.

Indeed, to the contrary, the Maine legislature in 1985 enacted the "Workers' Compensation Competitive Rating Act," which directed that workers' compensation insurance rates be rolled back at least 8% and frozen at that level until 1987. Me.Rev. Stat.Ann. tit. 24–A, §§ 2331–2357 (1985) (repealed). Under the Act, insurers were prohibited from requesting rate increases exceeding 10% in 1987, 1988 and 1989. *Id.* at § 2355. In addition, the 1985 Act declared that it was intended, *inter alia:*

> 1. ... To prohibit price fixing agreements and other anticompetitive behavior by insurers.
>
> ...
>
> 3. ... To promote price competition among insurers....

*Id.* at § 2332.

The insurers challenged the 1985 act in court. Although the Maine Superior Court determined that the rate ceilings were so low that they were confiscatory, the court held that the ceilings were not unconstitutional because insurers were free to withdraw from the market for workers' compensation insurance in Maine. *National*

Council on Compensation Ins. v. Superintendent of Ins., CV–85–459 (Sup.Ct. May 14, 1987) (Alexander, J.), *appeal dismissed,* 538 A.2d 759 (Me.1988) (dismissed as moot because 1987 legislation repealed 1985 Act).

In this lawsuit, plaintiffs assert that defendants, unable to achieve their goals legally, resorted to improper means. Plaintiffs contend that defendants allegedly conspired to fix prices at a higher-than-lawful rate and to conduct a boycott of the Maine workers' compensation market to induce legislation authorizing rate increases. As early as 1986, plaintiffs claim, defendants jointly began refusing to insure employers voluntarily, requiring them to obtain workers' compensation coverage through the "residual" or "involuntary" system. Every insurer authorized to write workers' compensation policies in Maine is required by state law to participate in the "involuntary market" and, thus, to share the underwriting responsibility for employers otherwise unable to obtain coverage.[5] The conspirators allegedly increased the pressure on the Maine legislature to act when, between late summer and October 1987, virtually all workers' compensation insurers in Maine prepared to withdraw from the state.

To avert the crisis that would occur if all workers' compensation insurers left, Governor John McKernan convened a special session of the legislature devoted exclusively to reviewing and reforming Maine's workers' compensation system. In short order, the legislature approved the "Workers' Compensation Rating Act" (deleting the word "competitive" that had been in the title of the 1985 Act), Me.Rev.St.Ann. tit. 24–A, §§ 2361–2374 (West 1990 and 1992 Supp.). The 1987 Act removed the limitations on rate increases contained in the 1985 Act. It authorized NCCI to act as agent for its member insurance companies by submitting joint rate proposals on their behalf to the Superintendent of Insurance, who is the ultimate decisionmaker on the rates insurers may charge. Insurers are

---

5. Plaintiffs seem to suggest that the shift of employers from the voluntary to the involun-

tary market was in some way detrimental to them, but they do not explain how.

permitted, however, to deviate below the rate approved by the Superintendent.

In 1988, 1989 and 1990, the insurers collectively applied for rates beyond the limits allowed in the 1985 Act. Each year, the Superintendent rejected the requested rate increases, but authorized lower increases that still exceeded the 10% caps set by the 1985 legislation. Plaintiffs contend that, as part of the insurers' continuing price-fixing conspiracy, defendants unlawfully agreed to charge only the maximum rates allowed by the Superintendent.

Through this lawsuit, plaintiffs seek recovery of damages in the amount of the increased premiums they have paid since the 1987 Act was passed and defendants began charging higher rates. The district court concluded that this relief was barred because the alleged harm was directly traceable to the 1987 legislation and the approval of rate increases by the Maine Superintendent of Insurance. The court relied on the well-established *Parker* principle, *see* 317 U.S. at 350–52, 63 S.Ct. at 313–14, that injury caused by anticompetitive state action is not compensable under the antitrust laws. The court further believed that defendants' actions were protected by the *Noerr* doctrine, *see* 365 U.S. at 136–40, 81 S.Ct. at 528–31, which exempts from antitrust liability the collective efforts of private actors to promote anticompetitive legislation.

Plaintiffs argue on appeal that the district court erred because it mistakenly attributed their asserted injury to state action. They contend that they were harmed not by the legislation itself but by defendants' ongoing conspiracy to obtain and charge higher rates. *Parker*, they insist, is therefore inapplicable. They further assert that *Noerr* provides no immunity for defendants because the alleged conspiracy involved classic anticompetitive economic conduct—a boycott and price-fixing—rather than political activity such as lobbying or petitioning.

Defendants respond that, regardless of the nature of the conspiracy, which they admitted solely for purposes of the summary judgment proceedings, they cannot be assessed damages based on the premium increases authorized by state law. Because that is the only injury for which plaintiffs seek relief, defendants maintain that the district court correctly granted summary judgment.

## II.

The issues we face on this appeal are matters of law, and our standard of review is therefore de novo. *Liberty Mutual Ins. Co. v. Commercial Union Ins. Co.*, 978 F.2d 750, 757 (1st Cir.1992). Although plaintiffs repeated at oral argument a complaint earlier made to the district court that they had had inadequate time to develop the facts through discovery, we do not see how additional investigation could have affected the summary judgment decision. Defendants have admitted, for purposes of their motion, that they conspired to withdraw from the Maine workers' compensation market. Plaintiffs identify no other possibly discoverable fact that would be material to the legal issues before us. We note, moreover, that they have not appealed the district court's denial of their motion for additional discovery time.

Plaintiffs make a related claim that the district court erred in repeatedly failing to construe their complaint in the light most favorable to them, arguing that this standard of scrutiny—normally applicable to motions to dismiss—applies here because defendants conceded the material factual allegations of the complaint. This claim also is irrelevant to our disposition. As our analysis in the following sections will demonstrate, plaintiffs' appeal fails no matter how liberally their allegations concerning defendants' conspiracy are construed because the specific relief they seek is barred as a matter of law.

## III.

We begin our analysis with an aspect of the case that has engendered some confusion, but apparently no real disagreement among the parties. In the concluding paragraph of its opinion, the district court stated that "[t]he defendants' conspiracy to

press for legislation permitting them to charge higher rates—which in and of itself caused Plaintiffs no injury—is immune under *Noerr.*" Opinion at 819. The State of Maine construed this statement and similar references elsewhere in the opinion as holding that private actors lawfully may employ a concerted economic boycott to influence a legislative determination. Disturbed by this specific holding, the State sought and was granted permission to file an amicus brief limited to urging that we reverse the ruling.

■ We have some doubt that the district court intended the broad statement attributed to it by the State. Regardless, at this point, the State's position meets with no opposition from any party. Plaintiffs and defendants all agree that private actors who conduct an economic boycott violate the Sherman Act and may be held responsible for *direct marketplace injury* caused by the boycott, even if the boycotters' ultimate goal is to obtain favorable state action. This view, we find, clearly reflects Supreme Court precedent.

In *Noerr,* the Supreme Court held that the defendant railroads could associate for the purpose of waging a publicity campaign designed to secure legislative action harmful to the truckers with whom they competed, without implicating the Sherman Act prohibition against combinations in restraint of trade. 365 U.S. at 136–37, 81 S.Ct. at 528–29. The Court observed that, in a representative democracy, individuals must have the ability to "freely inform the government of their wishes," *id.* at 137, 81 S.Ct. at 529, and they are permitted to do so even if their motives are entirely anticompetitive, *id.* at 139–40, 81 S.Ct. at 530–31. Any other conclusion "would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of the Act." *Id.* at 137, 81 S.Ct. at 529.

■ *Noerr* does not protect from antitrust liability, however, *all* actions designed to influence government. The Court has made it clear that certain "combinations normally held violative of the Sherman Act," *id.* at 136, 81 S.Ct. at 529, including price-fixing agreements and boycotts, are not "outside the coverage of the ... Act simply because [their] objective was the enactment of favorable legislation," *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 424, 110 S.Ct. 768, 775, 107 L.Ed.2d 851 (1990). *See also Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 503–04, 108 S.Ct. 1931, 1938–39, 100 L.Ed.2d 497 (1988); *Noerr,* 365 U.S. at 136, 81 S.Ct. at 528. In other words, a classic economic restraint of trade is actionable even if its primary purpose is political.

This limitation on the *Noerr* doctrine was fully explored in *Trial Lawyers,* a case closely analogous to the one before us. *Trial Lawyers* involved a boycott organized by members of the District of Columbia criminal defense bar. The attorneys agreed not to accept any court appointments to represent indigent criminal defendants in order to force the District's City Council to raise the hourly rate of pay for court-appointed criminal defense work. The Supreme Court held that the boycott constituted a "plain violation of the antitrust laws," 493 U.S. at 428, 110 S.Ct. at 778, and that "[o]ur decision in *Noerr* in no way detracts from this conclusion," *id.* at 424, 110 S.Ct. at 776. *Noerr,* the Court emphasized, involved "mere attempts to influence the passage or enforcement of laws," *id.* (quoting *Noerr,* 365 U.S. at 135, 81 S.Ct. at 528), not an actual restraint on price and output, *id.* at 423, 110 S.Ct. at 775. The *Noerr* exception to antitrust liability thus was inapplicable to the lawyers' boycott. *Id.* at 428, 110 S.Ct. at 778.

The district court here sought to distinguish *Trial Lawyers* from the case before it, at least in part, because the anticompetitive conspiracy there was directed at the government, the District of Columbia City Council, as a commercial participant. Opinion at 819. The court appeared to view the government's role as a purchaser as significant to the Supreme Court's conclusion that *Noerr* immunity was unavailable:

> The goal of the trial lawyers' conspiracy was to inflict economic pain on the gov-

ernment, forcing it to pass legislation. In this case, however, the Defendants' alleged conspiracy was not intended to harm the government as a commercial participant in the marketplace, only to prompt it to pass anticompetitive legislation.

Opinion at 819. Consequently, the district court seemed to say, the conspiracy in this case was protected by *Noerr*.

*Trial Lawyers* does not establish a "government-as-market-participant" exception to *Noerr*. What was significant about the concerted activity there was not that the government was the purchaser, but that the defendants had sought to influence the government through an economic boycott that directly affected the marketplace by, *inter alia*, constricting the supply of lawyers available to represent indigent criminal defendants. The Court emphasized that *Noerr* provides immunity when the alleged restraint of trade is imposed *by the government* as the intended *consequence* of the defendants' concerted activity. It is inapplicable when private actors impose the challenged restraint of trade through a boycott or other traditionally unlawful economic measure, even when the boycott's sole purpose is to instigate favorable governmental action.

■ Whether the boycotted purchaser is the government or a private individual is irrelevant; the significant factor is direct market effect.

> The restraint of trade that was implemented while the boycott lasted would have had precisely the same anticompetitive consequences during that period even if no legislation had been enacted. In *Noerr*, the desired legislation would have created the restraint on the truckers' competition; in this case the emergency legislative response to the boycott put an end to the restraint.

*Trial Lawyers*, 493 U.S. at 425, 110 S.Ct. at 776.

■ Here, too, the defendants allegedly employed an economic boycott that beyond doubt " 'constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act,' " *id.*, 493 U.S. at 422, 110 S.Ct. at 774 (quoting Court of Appeals, 856 F.2d 226, 234 (1988)). Had these or other plaintiffs sought injunctive relief during the boycott period, or had they sought damages based on the boycott's direct market effects (such as reduced availability of insurance or higher prices resulting from reduced competition during the boycott period), they would have had a viable antitrust claim. These plaintiffs, however, explicitly have disclaimed any request for relief based on injury occurring while the boycott was in place, before the Maine Legislature passed the 1987 Act.[6]

In all likelihood, it was the plaintiffs' decision to pursue only post-legislation damages that influenced the district court to state broadly that defendants were immune from liability. The court correctly recognized that a conspiracy to press for legislation permitting defendants to charge higher rates was permissible unless it was implemented through an actual restraint on trade. Because plaintiffs sought no direct market damages from the boycott, the court evidently treated the boycott not as a prohibited restraint of trade but as a lobbying effort equivalent to the unethical and deceptive publicity campaign waged by the defendants in *Noerr*.

In so doing, the court may have overstated its holding unintentionally, permitting the inference drawn by the government that the boycott itself was being held immune under *Noerr*. As we have explained, such a holding would conflict with Supreme Court caselaw. Defendants' boycott plainly constituted a *per se* violation of the Sherman Act even though plaintiffs seek no marketplace damages resulting from it.

## IV.

The central issue before us is whether plaintiffs may recover damages based on the higher rates they have paid for workers' compensation insurance since enact-

---

**6.** We offer no view as to whether plaintiffs would have been able to prove damages from a constriction of supply or absence of price competition resulting from the conspiracy.

ment of the 1987 legislation. The district court ruled that the state action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, precluded such relief because the rate increases were authorized by the Maine Legislature, and adopted and implemented by the state's Superintendent of Insurance.

In *Parker,* "[r]elying on principles of federalism and state sovereignty, [the Supreme Court] held that the Sherman Act did not apply to anticompetitive restraints imposed by the States 'as an act of government.' " *City of Columbia v. Omni Outdoor Advertising, Inc.,* — U.S. —, —, 111 S.Ct. 1344, 1349, 113 L.Ed.2d 382 (1991) (quoting *Parker,* 317 U.S. at 352, 63 S.Ct. at 314). The district court believed that the actions of the legislature and Superintendent of Insurance superseded defendants' previous conduct, rendering the rate hikes "an act of government" immune under *Parker* rather than an injury inflicted by defendants' conspiracy.

Plaintiffs offer two reasons why the *Parker* doctrine does not bar the relief they seek. First, in an argument more heavily utilized in the district court, plaintiffs maintain that the defendants' use of unlawful activity to coerce the favorable legislation makes the *Parker* doctrine inapplicable. Because the legislature unlawfully was pressured to act, they contend, the statute may not be used to insulate defendants from responsibility. Second, plaintiffs argue that it was not the legislation simply permitting rate hikes that harmed them, but the defendants' longstanding conspiracy to charge the maximum possible rates.

Neither of these arguments is persuasive. The first contention, that the defendants' coercive conduct circumscribes the effect of the legislature's actions, is directly contradicted by Supreme Court precedent. In a recent case, *Omni,* — U.S. at —, 111 S.Ct. at 1352, the Court reaffirmed its previously stated determination that *Parker* immunity turns on *who* imposed the challenged restraint, not *why:*

"[W]here the action complained of ... was that of the State itself, the action is

exempt from antitrust liability regardless of the State's motives in taking the action."

*Id.* — U.S. at — – —, 111 S.Ct. at 1352–53 (quoting *Hoover v. Ronwin,* 466 U.S. 558, 579–80, 104 S.Ct. 1989, 2001, 80 L.Ed.2d 590 (1984)).

*Omni* rejected a proposed conspiracy exception to the *Parker* doctrine that would have denied immunity when government employees were involved as conspirators with private actors in the challenged restraint of trade. The Court considered possible methods for defining a conspiracy exception, including an approach that would make *Parker* inapplicable only if, in connection with the governmental action in question, bribery or some other violation of state or federal law were established. *Id.* — U.S. at —, 111 S.Ct. at 1353. It ultimately concluded that any such limitation would be, at best, an imprecise way to determine which anticompetitive state actions should be exempted from antitrust liability.

> Such unlawful activity has no necessary relationship to whether the governmental action is in the public interest. A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid.... To use unlawful political influence as the test of legality of state regulation undoubtedly vindicates (in a rather blunt way) principles of good government. But the statute we are construing is not directed to that end.

*Id.*

The holding in *Omni* fully embraces plaintiffs' tendered coercion exception. Allegations of coercion, like those of conspiracy, implicate only the off-limits issue of the legislators' motivation. *Omni* reaffirms that the state action protection provided by *Parker* is not vulnerable to such claims.

Plaintiffs' second theory bears down more closely on the 1987 legislation. Because the statute does not *mandate* that insurers charge the maximum rates allowed by the Superintendent, but merely eliminated the caps imposed by the repealed 1985 Act, plaintiffs maintain that

the higher rates by which they were damaged resulted from defendants' conspiracy to charge the maximum rates and not from the legislature's adoption of the statute. We detect two problems with this argument.

First, the manner in which plaintiffs asserted this theory before the district court differed in a subtle, yet significant, way from the approach adopted on appeal. Throughout the proceedings before the district court, plaintiffs emphasized that they alleged injury from a conspiracy initiated in the summer and fall of 1987 to violate the *1985* legislation, which promoted open competition in the workers' compensation market.

> Plaintiffs do not claim that they were injured by actions mandated by the 1987 legislation. Indeed, plaintiffs allege not only that the conspiracy began before the 1987 legislation was even enacted, but that the *objective* of the conspiracy was that very enactment. Plaintiffs in fact allege that they were injured by defendants' conspiracy to violate the *1985* legislation. It is therefore the 1985 legislation against which state action claims must be tested.

Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment, at 18 n. 11 (emphasis in original).

At oral argument on the summary judgment motion, plaintiffs again asserted that it had been unlawful for the defendants to conspire to increase prices while the 1985 legislation governed. *See* App. at 720. When the district court asked why the defendants' actions were not protected in light of their "acting within the framework set up by the legislature in the enactment of rates," plaintiffs' counsel responded that "one needs to be clear on the time frame." *Id.* at 729. He continued:

> At the time the conspiracy was hatched and effectuated in summer and fall of 1987, the policy of the State of Maine

was open competition in workers' comp. The policy of the State of Maine was, "Go compete with each other."

> And these defendants had a private agreement, in effect, not to compete and to boycott consumers and the state.

*Id.*

Thus, the argument to the district court focused on conduct leading up to the 1987 act: the defendants unlawfully conspired to charge higher rates, and obtained permission to do so through unlawful means, making the new rates wholly a result of defendants' unlawful conduct. Moreover, the plaintiffs argued, even though the specific harm for which they sought damages did not occur until after the law was changed and higher rates authorized, defendants had to be held responsible so that their past illegal conduct would not be immunized retroactively. Failing to hold them liable, plaintiffs argued,

> would lead to the anomalous result that *unsuccessful* boycotts (*i.e.* boycotts which do not successfully coerce governmental action) would be antitrust violations, but that *successful* boycotts (*i.e.* boycotts to which government succumbs in order to avoid chaos or disaster) would be immunized.

Plaintiffs' Memorandum in Opposition, at 35–36 (emphasis in original) (footnote omitted).[7]

The argument on appeal unquestionably adds a new dimension. Plaintiffs now contend that, after passage of the 1987 act, defendants again violated antitrust laws by conspiring to refuse to sell below the new maximum rates established by the Superintendent of Insurance. That agreement is not entitled to state action immunity, plaintiffs suggest, because the provision in the 1987 Act allowing independent ratesetting demonstrates that state policy still favors competition. Consequently, plaintiffs contend that defendants should be held liable for the rate increases.[8]

---

7. As we made clear in Section III, the response to this argument is that unlawful boycotts with direct marketplace impact will result in accountability for the *market* injury, regardless of their success in inducing governmental action.

8. We note that some portions of plaintiffs' appellate brief retain the focus on the 1985 legislation:

> Plaintiffs do not challenge the Defendants' "participation in ratesetting proceedings" in

This link between plaintiffs' conspiracy allegation and the 1987 Act never was offered to the district court; indeed, as noted above, plaintiffs expressly disclaimed the new statute's relevance to the *Parker* issue. The conspiracy achieved success, plaintiffs asserted, when the State enacted the law allowing higher premiums. *See* Memorandum in Opposition to Summary Judgment, at 2–3 (quoted in District Court Opinion, at 811–12). Led by these arguments, the district court never considered whether the defendants could be held responsible for the rate increases—despite authorization of those rates by the state— if they had conspired not to deviate below the maximum rate.

■ Whether plaintiffs sufficiently preserved this argument need not unduly detain us, however, because the theory is in any event unavailing. When the legislature enacted the 1987 statute, it did not simply eliminate the ceiling on the permissible rates for workers' compensation insurance, but it also moved away from the state's previous pro-competitive policy toward ratesetting. The 1987 Act provided for joint rate filings [9] and, in our view, it must be construed as implicitly condoning an agreement among insurers to charge the rates they jointly propose, subject to approval by the Superintendent. When insurers work together within a state regulatory system to advocate rates that they all presumably believe are appropriate for workers' compensation insurance, we fail to see how it could be illegal price fixing for them also subsequently to agree to charge the rates allowed by the state, particularly when the approved rates fall below the jointly proposed rates.

At a minimum, it must be lawful for insurers to agree to charge the approved rate where, as here, the Superintendent's obligation is to establish rates that are "[j]ust and reasonable" and "[b]ased only on a just and reasonable profit." Me.Rev. Stat.Ann. tit. 24–A, § 2363(7)(A)(1), (2). Thus, while the statute stipulates that these rates set the upper limit on permissible charges, *id.* at § 2362, the expectation clearly is that the Superintendent's rates are the ones that generally will be appropriate for, and thus used by, all insurers. In this context, the legislature evidently viewed the sort of "price fixing" alleged by plaintiffs as benign; notably absent from the 1987 statute is a provision contained in the 1985 Act prohibiting insurers from agreeing "to adhere to or use a rate or rating plan," *id.* at § 2347(2) (1985) (repealed).

Plaintiffs rely on the provision allowing downward rate deviation to support their claim that defendants' conspiracy to charge a uniform rate was unauthorized and, consequently, not immunized under *Parker*. But the fact that insurers *may* charge less than the approved rate is of little significance when it is juxtaposed with the uniform approach to ratemaking that is the overriding characteristic of the reformed system. On its own, the permissive provision certainly does not establish a state policy favoring competitive pricing. Moreover, the Supreme Court, in *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), explicitly held that *Parker* immunity is available to private parties acting pursuant to a regime of collective ratemaking that is authorized, though not compelled, by the state.

1988 after the 1987 legislation was enacted repealing the 1985 Competitive Rating Act. What Plaintiffs challenge is Defendants' *conspiracy* begun in 1986 and 1987, at a time when Maine law specifically prohibited such conspiracies, to constrict supply, to fix prices, and to boycott consumers *in order to coerce the removal of the existing price ceiling.* Plaintiffs' Brief at 31 (additional emphasis added).

9. It did so somewhat indirectly through repeal of the 1985 Act, which meant that the joint

ratemaking provisions that then existed for all lines of insurance sold in Maine again were applicable to workers' compensation insurance. In 1989, the legislature revised the general insurance ratemaking system to encourage competition, leaving the joint ratemaking provisions applicable *only* to the workers' compensation providers. *Compare* Me.Rev.Stat.Ann. tit. 24–A, § 2309 (West 1990) *with* Me.Rev.Stat.Ann. tit. 24–A, § 2309 (West Supp.1992).

*Southern Motor Carriers* involved a challenge to the joint activities of motor common carrier rate bureaus in four states where carriers were permitted to agree on rate proposals before their submission to state agencies. In the course of its decision, the Court reaffirmed the two-pronged test set forth in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), for determining whether the anticompetitive conduct of private parties within a state regulatory scheme is shielded from the antitrust laws:

> First, the challenged restraint must be " 'one clearly articulated and affirmatively expressed as state policy.' " Second, the State must supervise actively any private anticompetitive conduct.

471 U.S. at 57, 105 S.Ct. at 1727 (citations omitted).

The justices then considered whether the actions of a private party can be attributed to a clearly articulated state policy, within the meaning of the *Midcal* test's first prong, even if the state does not compel the challenged anticompetitive activity. *Id.* at 59–60, 105 S.Ct. at 1727–28. The Court observed that a compulsion requirement would reduce the range of alternatives available to a state that wished to regulate a given industry—thereby negatively affecting principles of federalism—while perhaps also causing *greater* restraints on trade—thereby impairing the goal of the antitrust laws to ensure "unfettered competition in the marketplace," *id.* at 61, 105 S.Ct. at 1729. Declining to "believe that Congress intended to resolve conflicts between two competing interests [federalism and competition] by impairing both more than necessary," *id.*, the Court concluded that "a state policy that expressly *permits*, but does not compel, anticompetitive conduct may be 'clearly articulated' within the meaning of *Midcal*," *id.* (emphasis in original).

In this case, it is manifestly clear that defendants' ratemaking activities meet both prongs of the *Midcal* test. The new scheme was adopted by the legislature, fulfilling the state policy prong of the test, and the Superintendent's involvement in reviewing and modifying the insurers' proposed rates unquestionably meets prong two's requirement of active state supervision. Indeed, plaintiffs expressly acknowledge that *Midcal* is satisfied with respect to the ratemaking proceedings. *See* Reply Brief, at 19 n. 15. Plaintiffs instead hammer on defendants' "converting the results of that ratemaking proceeding, *i.e.* a schedule of *maximum* or ceiling prices, into a *private* agreement to uniformly charge the maximum price, and to refuse to deal at prices below that level." *Id.* (emphasis in original).

This argument misfires because it fails to take into account the changed landscape. Even if defendants violated the Sherman Act in the late summer and early fall of 1987 by conspiring to raise the maximum prices they could charge beyond those permitted by the 1985 Act, it does not necessarily follow that it was unlawful for them to agree to charge the rate subsequently approved by the Superintendent pursuant to the 1987 Act. Once the legislature acted in November 1987, defendants' conduct had to be assessed in light of the new state policy and procedures. As we have discussed, the 1987 Act endorsed cooperative ratesetting and anticipated that most, if not all, insurers would charge the newly authorized rates. Accordingly, the damages sought by plaintiffs—the differential between the rates allowed under the 1985 Act and the new rates charged by defendants under the 1987 Act—must be viewed as a product of state action. The district court therefore correctly concluded that, under *Parker*, defendants may not be held accountable for this claimed injury.

V.

In summary, we hold that the economic boycott and price fixing conspiracy allegedly conducted by defendants in the summer and early fall of 1987 constituted a *per se* violation of the Sherman Act, and did not fall within the *Noerr* doctrine's protection for concerted activity designed to elicit favorable legislation. But plaintiffs have not

sought damages for direct marketplace injury inflicted by that conspiracy.

The monetary damages alleged by plaintiffs—the amount of increase in their workers' compensation insurance rates under the 1987 statutory scheme allegedly coerced by defendants—are not recoverable from the insurers. Because the state authorized collective ratemaking and closely supervised the setting of higher rates, any agreement among defendants to charge the maximum authorized rates is permissible, and defendants are immune from liability for the increase under the *Parker* doctrine.

*Affirmed.*