UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-1104

OLLIE LATTIMORE,

Plaintiff - Appellee,

v.

POLAROID CORPORATION,

Defendant - Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Torres* and Saris,** District Judges. 



Stephen B. Deutsch, with whom Michael L. Rosen and Foley, 
Hoag & Eliot were on brief for appellant. 
Stephen Wald, with whom William F. Macauley, Anthony D. 
Rizzotti and Craig and Macauley were on brief for appellee. 



November 1, 1996


 

* Of the District of Rhode Island, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

TORRES, District Judge. Polaroid Corporation TORRES, District Judge 

("Polaroid") appeals from a judgment entered in favor of Ollie

Lattimore with respect to several claims of racial harassment and

employment discrimination brought pursuant to 42 U.S.C. 

2000(e)-1 et seq. ("Title VII") and Mass. Gen. L. ch. 151B, 4 

("Chapter 151B"). Polaroid contends that the District Court

erred in denying Polaroid's motions for summary judgment, for

judgment as a matter of law and for a new trial. Because we

conclude that the motion for judgment as a matter of law should

have been granted with respect to some of Lattimore's claims and

because it appears that the jury's verdict may have rested on

those claims, we vacate the judgment and remand for a new trial.

Factual Background Factual Background 

Ollie Lattimore, a black man, was hired by Polaroid in

1977 as a machine operator. During part of Lattimore's tenure at

Polaroid, his supervisor was Bill Mitchell, a white man. In

1978, Lattimore sustained a job-related back injury that

resulted in his being placed on a "medical restriction" that

limited his duties to tasks that did not require repetitive

bending, twisting or lifting objects weighing more than fifteen

pounds. The restriction was renewed each year until 1989 and,

because of it, Lattimore was assigned to light-duty work.

At trial, Lattimore testified that, in March of 1989,

Mitchell assigned him to certain janitorial tasks that required

heavier lifting. When Lattimore protested that his medical

restriction prevented him from performing those tasks, Mitchell

-2-

allegedly replied, "I'm sick of you people all the time lazy,

trying to skip work. There is the door. Don't let it hit you in

the ass." Lattimore interpreted the statement as a racial slur

and stated that he began doing the janitorial work because he

feared for his job. Mitchell denied asking Lattimore to perform

tasks prohibited by his medical restriction and also denied

making the statement attributed to him.

According to Lattimore, on March 16, 1989, he re-

injured his back while emptying a barrel into a dumpster. Later

that day, he was seen by Dr. Hillier, a physician who had been

treating him for his pre-existing back problems. Dr. Hillier

provided Lattimore with the first in a series of reports stating

that Lattimore was disabled from returning to work. The

following day, Lattimore presented the report to Mitchell who

allegedly said, "I'm getting sick and tired of you people.

You're all lazy all the time." Mitchell denied making that

statement, too.

In any event, Polaroid immediately placed Lattimore on

short-term disability ("STD") status pursuant to the company's

short-term disability policy. Under that policy, an employee is

eligible for STD benefits if medical reports submitted by the

employee's treating physician support the conclusion that the

employee is totally disabled. The policy further provides that

in the event that Polaroid's Medical Review Board ("the Board")

disagrees with the assessment by the employee's physician,

Polaroid may require an independent medical examination ("IME"),

-3-

the results of which will be deemed conclusive with respect to

the employee's ability to work.

Approximately twelve weeks after Lattimore was accorded

STD status, Dr. Kantrowitz, Polaroid's medical director and the

chairman of the Medical Review Board, spoke to Dr. Hillier about

Lattimore's condition. Dr. Hillier indicated that Lattimore was

improving and should be able to return to work on July 24 if an

examination scheduled for July 21 showed the progress that

Dr. Hillier anticipated.

After subsequently receiving a report from Dr. Hillier

listing Lattimore's condition as "undetermined" and learning that

the examination scheduled for July 21 had been postponed until

August 8, the Board decided to require an IME without waiting for

the results of Dr. Hillier's examination. Polaroid claims that

the Board's decision was based on ambiguities in Dr. Hillier's

reports and on the results of a July 13 workers' compensation

examination performed by Dr. James Dolphin which indicated that

Lattimore was able to perform light work. Apparently, Dr.

Dolphin's findings had caused Lattimore to be denied workers'

compensation benefits.

The Board gave Lattimore the opportunity to select one

of three "independent" physicians to conduct the IME and he chose

Dr. Marcos Ramos. The IME was performed on August 23. According

to Lattimore, the examination was very brief and did not include

any diagnostic tests. Dr. Ramos, on the other hand, indicated

that the examination was thorough and lasted approximately one

-4-

and one-half hours.

The following day, Richard Williams, Polaroid's

corporate benefits administrator, informed Lattimore that Dr.

Ramos had determined that Lattimore was not totally disabled;

that he could return to light-duty work immediately and that he

could resume full duties in two weeks. Accordingly, Williams

instructed Lattimore to return to work the next day. Although

Williams' statements regarding Dr. Ramos' conclusions were

consistent with the findings contained in Dr. Ramos' written

report, the report was not issued until one week later. Williams

sought to explain this by testifying that the findings were

related to him during a telephone conversation with Dr. Ramos on

August 23. However, Dr. Ramos had no recollection of any such

conversation.

Matters came to a head when Lattimore refused to return

to work asserting that he still was totally disabled. On

September 9, Lattimore's employment was terminated. Polaroid

presented evidence that the decision was made by Eddy Montes,

Lattimore's new supervisor, based upon the company's policy of

terminating employees who refused to work after being removed

from STD status.

Procedural History Procedural History 

On October 27, 1989, Lattimore filed a written

administrative charge with the Massachusetts Commission Against

Discrimination ("MCAD") and with the Equal Employment Opportunity

Commission ("EEOC"). The charge recited that Lattimore had

-5-

sustained a back injury on March 16, 1989, and had filed for

worker's compensation benefits on June 26, 1989. It went on to

state that he was later fired for refusing to return to work even

though his back injury rendered him totally disabled. Based on

that account of the pertinent events, Lattimore alleged that:

Respondent does not treat white workers
who are handicapped and have filed for 
workers compensation the way they have 
treated me. Ray (Lnu), a machine
operator in my department, has been out
on workers comp numerous times and has
not been harassed and fired as I have
been. I believe I was fired and treated
differently due to my race, black, and my
handicap, back injury, . . . (emphasis
added).

After investigating and finding no probable cause to

believe that Polaroid had discriminated against Lattimore, the

MCAD dismissed the charge. The EEOC did not conduct any

independent investigation but accepted MCAD's finding and issued

Lattimore a right-to-sue letter on March 24, 1992.

On June 22, 1992, Lattimore, acting pro se, commenced 

this action in the District Court. His complaint was more

detailed than the administrative charge but covered essentially

the same ground. It alluded to the March 16 back injury which

Lattimore attributed to being assigned to duties inconsistent

with his medical restriction. It also stated that, after being

placed on STD status, Lattimore was wrongfully removed from that

status when he applied for workers' compensation benefits that

would have supplemented his disability payments. Finally, the

complaint referred to Lattimore's termination for refusing to

-6-

return to work despite his claim that he was unable to do so.

Like the administrative charge, the complaint asserted that,

because of his race, Lattimore was denied benefits to which he

was entitled. More specifically, it stated:

I believe that the Polaroid Corp. used
the fact that I was an uneducated black
to hinder my every effort to receive the
compensation which was due me both
through the Workmen's Compensation laws
and the Company's Short Term and Long
Term Disability programs.

Nine months later, after retaining counsel, Lattimore

amended his complaint. The amended complaint, for the first

time, alleged that, on unspecified occasions after Lattimore's

1979 back injury, "supervisors and other employees at Polaroid

harassed . . . [him] . . . about his handicap" and that such

harassment was "coupled with verbal reference to Lattimore's

race."

The amended complaint contained five counts asserting a

variety of claims for both handicap and race discrimination. The

District Court granted Polaroid's motion for summary judgment

with respect to three of the counts but denied the motion with

respect to the other two counts. The case proceeded to trial on

those two counts which encompassed four claims: (1) racial

harassment by co-employees in violation of Title VII; (2) racial

harassment by co-employees in violation of Chapter 151B; (3) race

discrimination regarding terms and conditions of employment in

violation of Title VII; and (4) race discrimination regarding

terms and conditions of employment in violation of Chapter 151B.

-7-

During trial, evidence was presented relating to all

four claims. That evidence included testimony about the comments

allegedly made by Mitchell on or before March 16 and how Mitchell

allegedly coerced Lattimore into performing work inconsistent

with his medical restriction thereby causing the March 16 injury.

At the conclusion of Lattimore's case and, again, at the close of

the evidence, Polaroid moved for judgment as a matter of law with

respect to all four claims. The grounds for those motions were

essentially the same as the grounds relied upon in Polaroid's

previous motion for summary judgment. Like the motion for

summary judgment, the motions for judgment as a matter of law

were denied.

The District Judge charged the jury on all four claims

but a questionnaire submitted to the jury asked only for

determinations of whether Lattimore was "racially harassed,"

whether any such harassment proximately caused injury and, if so,

the amount of damages to be awarded.1 See Appendix A.2 The jury 

answered the first two questions in the affirmative and fixed

damages at $400,000.

After denying Polaroid's motion for a new trial, the

District Court entered judgment for Lattimore in the amount of

 

1 Polaroid's counsel did raise an objection to the
questionnaire, but that objection appeared to be directed only to
the time frame during which the alleged harassment may have
occurred.

2 In his brief, Lattimore's counsel erroneously describes the
questionnaire as asking whether Polaroid "unlawfully
discriminated." Appellee's Br. at 3.

-8-

$562,000 representing the damages fixed by the jury plus

interest. It is from that judgment that Polaroid appeals.

In its appeal, Polaroid asserts that the District Court

erred in denying Polaroid's motion for summary judgment and/or

judgment as a matter of law and in denying Polaroid's motion for

a new trial. Our analysis is limited to reviewing the denial of

the motion for judgment as a matter of law because the

conclusions we reach render the remaining claims of error moot.

Discussion Discussion 

Polaroid argues that it was entitled to judgment as a

matter of law on the harassment claims asserted under both Title

VII and Chapter 151B because those claims were beyond the scope

of Lattimore's administrative charge. Polaroid also contends

that judgment in its favor should have been entered regarding the

Title VII harassment claim because Lattimore provided no evidence

that Polaroid knew or should have known of the alleged

harassment. Finally, Polaroid asserts that the Chapter 151B

harassment claim is barred because the administrative charge was

not filed within the period of time prescribed by Massachusetts

law.

With respect to the discrimination claims Polaroid

argues that Lattimore failed to establish a prima facie case 

because he presented no evidence that he was totally disabled, a

sine qua non of eligibility for continued STD status. In 

addition, Polaroid maintains that it is entitled to judgment on

the discrimination claims because there was insufficient evidence

-9-

that its proffered reason for denying Lattimore continued STD

status and later terminating his employment was pretextual.

Finally, Polaroid asserts that the Title VII discrimination claim

fails due to the absence of any evidence of discriminatory intent

on the part of Polaroid.

I. Standard of Review I. Standard of Review 

We review, de novo, a District Court's denial of a 

motion for judgment as a matter of law. Sandy River Nursing Care 

v. Aetna Casualty, 985 F.2d 1138, 1141 (1st Cir.), cert. denied, 

510 U.S. 818, 114 S. Ct. 70 (1993). Like the District Court, we

are required to consider the evidence in the light most favorable

to the party against whom the motion is directed and to draw all

reasonable inferences favorable to that party. Aetna Casualty 

Surety Co. v. P&B Autobody, 43 F.3d 1546, 1556 (1st Cir. 1994). 

II. The Harassment Claims II. The Harassment Claims 

Harassment based on membership in a protected class is

one form of employment discrimination. In sex discrimination

cases, we have recognized that workplace harassment may take

either of two forms. It may consist of promises of favorable

treatment or threats of unfavorable treatment calculated to

coerce an employee into submitting to unwelcome sexual advances

(i.e., quid pro quo harassment). Lipsett v. Univ. of Puerto 

Rico, 864 F.2d 881, 897 (1st Cir. 1988). Alternatively, it may 

consist of offensive, gender-based conduct that is "severe or

pervasive enough to create an objectively hostile or abusive work

environment -- an environment that a reasonable person would find

-10-

hostile or abusive" and is subjectively perceived by the victim

to be abusive. Harris v. Forklift Systems, Inc., 510 U.S. 17, 

21, 114 S. Ct. 367, 370 (1993). While the concept of quid pro 

quo harassment has no application to race discrimination cases, 

the concept of hostile environment harassment does. Daniels v. 

Essex Group, Inc., 937 F.2d 1264 (7th Cir. 1991); Johnson v. 

Teamsters Local Union No. 559, 1995 WL 355304 (D. Mass. 1995), 

appeal docketed, No. 87-215 (1st Cir. Oct. 25, 1995). 

Hostile environment harassment is readily

distinguishable from "job status" discrimination, another type of

employment discrimination that occurs when action is taken that

adversely affects an employee's job status, remuneration or

benefits and it is based upon the employee's membership in a

protected class. See, e.g., Tart v. Hill Behan Lumber Co., 31 

F.3d 668, 672 (8th Cir. 1994). Thus, when both harassment and

"job status" discrimination claims are made, they are analyzed

separately. See, e.g., Lipsett, 864 F.2d 881 (sex 

discrimination); Edwards v. Wallace Community College, 49 F.3d 

1517 (11th Cir. 1993) (race discrimination). A job status

discrimination claim is not converted into a harassment claim

simply because it is labeled as such.

In this case, Lattimore's harassment claims are hostile

work environment claims. Moreover, although the administrative

charge relating to the denial of workers' compensation benefits

and continued STD status uses the word "harassment," that label

does not alter the fact that the harassment claims are based

-11-

entirely upon the comments allegedly made by Mitchell and upon

the allegation that Mitchell coerced Lattimore to perform tasks

inconsistent with his medical restriction. Clearly the alleged

harassment must have occurred on or before March 16, 1989,

because that is when Lattimore ceased work and, therefore, was no

longer subject to any hostile work environment. That is

confirmed by Lattimore's brief which describes the harassment

claims as being "for the March 1989 events which led to

Lattimore's total disability." Appellee's Br. at 2.

Polaroid does not seriously question whether the March

1989 conduct alleged by Lattimore was so severe and pervasive

that it created a hostile work environment. Polaroid's principal

argument is that the harassment claims are barred because they

are beyond the scope of the administrative charge filed by

Lattimore.

Both Title VII and Chapter 151B require an employee to

file an administrative charge as a prerequisite to commencing a

civil action for employment discrimination. See 42 U.S.C.  

2000e-5(f); Mass. Gen. L. ch. 151B, 5-9. The purpose of that

requirement is to provide the employer with prompt notice of the

claim and to create an opportunity for early conciliation. See 

Powers v. Grinnell Corp., 915 F.2d 34, 37 (1st Cir. 1990) 

(addressing charge requirements under the ADEA); Ruffino v. State 

Street Bank and Trust Co., 908 F. Supp. 1019, 1037 (D. Mass. 

1995).

That purpose would be frustrated if the employee were

-12-

permitted to allege one thing in the administrative charge and

later allege something entirely different in a subsequent civil

action. Consequently, we have stated that, in employment

discrimination cases, "[t]he scope of the civil complaint is . .

. limited by the charge filed with the EEOC and the investigation

which can reasonably be expected to grow out of that charge."

Powers, 915 F.2d at 38 (quoting Less v. Nestle Co., 705 F. Supp. 

110, 112 (W.D.N.Y. 1988)); see also Johnson v. General Electric, 

840 F.2d 132, 139 (1st Cir. 1988).

In cases where, as here, the employee acts pro se, the 

administrative charge is liberally construed in order to afford

the complainant the benefit of any reasonable doubt. Westphal v. 

Waukesha Dresser/Waukesha Engine Div., 855 F. Supp. 1009, 1015 

(E.D. Wis. 1994); Pickney v. Am. Dist. Tel. Co., 568 F. Supp. 

687, 690 (E.D. Ark. 1983). As we have said, an employee is not

required to comprehensively set forth with "literary exactitude"

all of the facts and theories upon which his or her claim is

based. See Powers, 915 F.2d at 38 (citations omitted). 

However, pro se status does not relieve an employee of 

the obligation to meet procedural requirements established by

law. See United States v. Michaud, 925 F.2d 37, 41 (1st Cir. 

1991). Even a pro se complainant is required to describe the 

essential nature of the claim and to identify the core facts on

which it rests. Id. Moreover, the latitude extended in pro se 

employment discrimination cases does not allow the complainant

"to file general charges with the [administrative agency] . . .

-13-

and then expect that this allegation will permit all claims of

race-based discrimination in a subsequent law suit." Tart, 31 

F.3d at 673 (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 

1112 (7th Cir. 1992)). Nor does it entitle the complainant to

make a specific claim based on one set of facts and, later,

assert an entirely different claim based on a different and

unrelated set of facts. Pickney, 568 F. Supp. at 690. 

In this case, Lattimore's administrative charge plainly

and specifically describes his claim to be that he was

discriminated against because, unlike white workers who had been

injured and applied for workers' compensation benefits, he was

directed to return to work and was fired when he refused. Those

allegations relate solely to employment decisions made by 

Polaroid after Lattimore's March 16 injury and cannot reasonably 

be construed to include any harassment by Mitchell before 

Lattimore's injury.

Indeed, there are indications that Lattimore himself

did not consider the events occurring before March 16 to be part

of his administrative charge. The pro se complaint that 

Lattimore filed in the District Court nearly three years later,

although more detailed than the administrative charge, also

focused entirely on Lattimore's removal from STD status and his

subsequent termination which he attributed to his application for

workers' compensation benefits and the fact that he was black.

Like the administrative charge, it failed to mention any pre-

injury harassment by Mitchell or anyone else. That claim was not

-14-

raised until ten months later when an amended complaint was filed

by Lattimore's counsel.

For many of the reasons already mentioned, we further

find that the harassment claims were not reasonably within the

scope of an agency investigation of Lattimore's administrative

charge. An investigation is a systematic inquiry into a

particular matter. When it is launched in response to a charge

of employment discrimination, the direction and scope of the

investigation are guided by the allegations contained in the

charge. Although an investigation is not strictly confined to

allegations in the charge, it is not a "fishing expedition" that

should be expected to extend to matters unrelated to the charge.

Here, Lattimore's charge focused exclusively on his

termination and the events leading up to it, all of which

occurred after his injury. It contains no hint of any claim

that, before his injury, Lattimore was harassed by Mitchell or

anyone else. It makes no mention of Mitchell or any incidents of

harassment.

The two claims are based upon different facts that are

separate and distinct both qualitatively and temporally. In

addition, they relate to the conduct of different individuals.

The record indicates that the decision to discontinue Lattimore's

STD status was made by the Board and that the termination

decision was made by Montes after consulting with Polaroid's

human resources department. On the other hand, it was Mitchell

who engaged in the alleged harassment. Therefore, it is

-15-

difficult to see how Mitchell's conduct before March 16

reasonably could be expected to be within the scope of an

agency's investigation of the charge. See Tart, 31 F.3d at 672- 

73.

Our finding in this regard is buttressed by MCAD's

Notice of Final Disposition which indicates that, in fact, its

investigation did not extend to any alleged harassment by

Mitchell. MCAD's findings focus exclusively on Lattimore's

termination and do not include any reference to claims of pre-

injury harassment.

Having decided that the harassment claims are beyond

the scope of Lattimore's administrative charge, we conclude that

judgment as a matter of law should be entered in favor of

Polaroid with respect to the harassment claims made pursuant to

both Title VII and Chapter 151B. Accordingly, there is no need

for us to consider Polaroid's arguments that the Title VII

harassment claim fails due to the absence of any evidence that

Polaroid knew or should have known of the alleged harassment

and/or that the Chapter 151B harassment claim is time barred.

III. The Job Status Discrimination Claims III. The Job Status Discrimination Claims 

The analytical framework applicable to employment

discrimination claims where there is no "direct" evidence of

discrimination is well established. First, the employee must

prove a prima facie case by demonstrating that he or she belongs 

to a protected class and was denied a position or benefits for

which the employee was qualified. The burden then shifts to the

-16-

employer to present a legitimate non-discriminatory reason for

its action. If that is done, the employee is afforded an

opportunity to prove that the proffered reason is pretextual.

See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805, 93 

S. Ct. 1817, 1824-26 (1973); Smith v. Stratus Computer, Inc., 40 

F.3d 11, 15-16 (1st Cir. 1994), cert. denied, U.S. , 115 

S. Ct. 1958 (1995); Blare v. Hicky Injection Molding Systems 

Boston, Inc., 646 N.E.2d 111, 114-17 (Mass. 1995). 

It is at this point that Massachusetts law and federal

law diverge. Since Massachusetts is a "pretext only"

jurisdiction, proof of pretext is sufficient to warrant a finding

of discrimination under Chapter 151B. Blare, 646 N.E.2d at 117. 

In contrast, Title VII requires that, in addition to proving

pretext, the employee also must prove that the employer was

motivated by a discriminatory purpose. St. Mary's Honor Center 

v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993); Smith, 

40 F.3d at 16 (employee has ultimate burden of proving "(1) that

the employer's articulated reason for the job action is a

pretext, and (2) that the true reason is discriminatory"); Woods 

v. Friction Materials, Inc., 30 F.3d 255, 260 (1st Cir. 1994) 

(employee must prove "both that the employer's articulated reason 

is false, and that discrimination was the actual reason for its

employment action."). When the prima facie case is very strong 

and disbelief of the proffered reason provides cause to believe

that the employer was motivated by a discriminatory purpose,

proof of pretext "may" be sufficient. Hicks, 509 U.S. at 511, 

-17-

113 S. Ct. at 2749; Smith, 40 F.3d at 16; Woods, 30 F.3d at 261 

n.3; see also Connell v. Bank of Boston, 924 F.2d 1169 (1st 

Cir.), cert. denied, 501 U.S. 1218, 111 S. Ct. 2828 (1991). 

Polaroid argues that it is entitled to judgment with

respect to both the Chapter 151B and Title VII discrimination

claims because Lattimore's evidence was insufficient to establish

either a prima facie case or that Polaroid's proffered reason was 

pretextual. Polaroid also argues that the Title VII claim fails

for the additional reason that there was no evidence of any

discriminatory intent on the part of Polaroid.

A. The Prima Facie Case A. The Prima Facie Case 

Ordinarily, when a claim of discriminatory firing is

made, the "qualified" prong of the employee's prima facie case 

consists of proof that the employee was adequately performing the

job in question. However, this case is somewhat atypical because

Lattimore does not claim that he was fired despite being able to

work. Instead, Lattimore claims that he was denied STD status

even though he was physically unable to work and that the loss of 

STD status resulted in his termination. Consequently, the issue

is whether Lattimore's evidence was sufficient to make a prima 

facie showing that he was qualified for STD status. 

Under Polaroid's STD policy, an employee must be

totally disabled from performing his or her job or any other work 

offered by the company in order to qualify for STD status. As

already noted, an employee may establish eligibility by

submitting periodic reports from a physician stating that the

-18-

employee is disabled. If the Medical Review Board disagrees with

the physician's opinion, it may require an IME to resolve the

dispute.

Polaroid argues that the record is devoid of any

evidence that Lattimore was "totally" disabled. That argument is

based principally on testimony by Dr. Hillier conceding that,

notwithstanding his previous reports to Polaroid stating that

Lattimore was totally disabled, Lattimore was able to perform

limited forms of light duty work at the time his STD status was

discontinued.

However, contrary to Polaroid's contention, that

testimony does not negate Dr. Hillier's previously expressed

opinion that, in August of 1989, Lattimore was "disabled." Nor

does it preclude a finding that Lattimore was "totally disabled"

within the meaning of Polaroid's STD policy.

It is clear that, both in August of 1989 and at the

time of trial, Dr. Hillier considered Lattimore totally disabled

from performing his usual job and felt it inadvisable for

Lattimore to work at all. The fact that Dr. Hillier also viewed

Lattimore as capable of performing some light duty tasks does not

undercut that opinion. Furthermore, Dr. Hillier's assessment is

perfectly compatible with Polaroid's own definition of "total

disability" because on August 23, when Lattimore was directed to

return to work, he was told that, after two weeks of unspecified

light duty, he would be expected to work without restriction of

any kind. Thus, Lattimore was not offered work that Dr. Hillier

-19-

considered him able to perform.

Moreover, in addition to Dr. Hillier's testimony and

reports, there was testimony from Lattimore himself that he was

physically unable to do any work because of his back injury.

Thus, there was sufficient evidence to establish the "total

disability" element of Lattimore's prima facie case. Any 

conflict between that evidence and conflicting medical evidence

presented by Polaroid, in rebuttal, was a matter for the jury to

resolve.

B. Pretext B. Pretext 

Lattimore's effort to prove pretext consisted

principally of evidence that, in discontinuing his STD status

and later terminating his employment, Polaroid deviated from its

established policies and practices. Polaroid argues that any

such irregularities were insufficient, as a matter of law, to

prove pretext.

Most of the "deviations" cited by Lattimore amount to

little more than quibbling over semantics (e.g., whether there

was a "disagreement" between Polaroid and Dr. Hillier that

justified Polaroid's request for an IME). However, there was

evidence from which a jury reasonably could have found that the

decision to discontinue Lattimore's STD status was made before

the Medical Review Board had obtained the results of Dr. Ramos'

IME. As already noted, Dr. Ramos' report was not issued until

approximately one week after the Board's decision and Williams' 

testimony that he learned of the results via a telephone

-20-

conversation with Dr. Ramos, was contradicted by Dr. Ramos. In

addition, Vincent Pina, a Polaroid director, testified that,

under Polaroid's STD policy, it was unimaginable that an employee

who had provided physicians' reports indicating disability would

be removed from STD status before the Board reviewed the IME

results.

There, also, was evidence suggesting that the results

of the IME may have been preordained. If a jury determined that

Williams never talked with Dr. Ramos about his findings, it could

infer that, in alluding to those findings in his August 23

letter, Williams must have known, in advance of the IME, what

those findings were going to be. Lattimore's testimony that the

examination was a perfunctory one, although disputed by Dr.

Ramos, and the evidence that Dr. Ramos did not perform any

diagnostic examinations or review Lattimore's medical records

could provide additional support for such an inference.

In short, although the evidence of pretext is thin,

disputed and susceptible to varying interpretations, it is

sufficient to create a jury question. Accordingly, since

Massachusetts law provides that an employee may prevail upon

proof of pretext, alone, the District Court did not err in

denying Polaroid's motion for judgment as a matter of law with

respect to the Chapter 151B claim.

C. Discriminatory Intent C. Discriminatory Intent 

As already noted, Title VII requires proof of something

more than pretext. It also requires proof of discriminatory

-21-

intent. Polaroid argues that there is no evidence that its

decisions to discontinue Lattimore's STD status and, later,

terminate his employment, were motivated by any discriminatory

intent. We agree.

Lattimore's claim of discriminatory intent is based

entirely upon allegations that Mitchell was involved in the

decisions and upon the fact that Polaroid's human resources

administrator was called to the scene when Lattimore returned to

the plant on August 24 and the discussion between him and

Williams apparently became heated.

As already noted, Polaroid presented evidence that the

decisions at issue were made by the Board and by Montes. In

support of his assertion that Mitchell participated in those

decisions, Lattimore cites evidence that, until shortly before

Lattimore's termination, Mitchell retained custody of Lattimore's

time cards and received copies of all medical reports regarding

Lattimore's physical condition. However, that evidence does not

tend to prove anything other than that Mitchell may have

continued to be Lattimore's "supervisor" during that period.

That fact, alone, has little significance inasmuch as Lattimore

was out of work and not being supervised. By itself, it is

insufficient to support a reasonable inference that Mitchell

participated, in any way, in the decision to remove Lattimore

from STD status or to fire him. Nor does it provide any basis

for concluding that any alleged racial prejudice on Mitchell's

part infected those decisions.

-22-

Similarly, the fact that Florence Ramos-Jones,

Polaroid's human resources administrator, was asked to

participate in the discussion with Lattimore on August 24 does

not establish any reasonable ground for finding that Polaroid's

decision was motivated by racial animus. Lattimore argues that,

because Ms. Ramos-Jones dealt with "racial issues," her

participation is evidence that Polaroid viewed Lattimore's

termination as a "racial matter." However, there was no

evidence regarding why Ms. Ramos-Jones became involved in that

discussion. If, for example, she became involved because

Lattimore, himself, raised the question of racial bias, her

participation would not provide any basis for inferring that

Polaroid's decision was discriminatory.

In the absence of any evidence regarding Mitchell's

involvement in the termination decisions or the circumstances and

nature of Ms. Ramos-Jones' participation in the August 24

discussion, there is no justification for the inferential leap

urged by Lattimore. Submitting the issue of discriminatory

intent to a jury on this record would amount to nothing more than

an invitation to speculate. Therefore, Polaroid is entitled to

judgment as a matter of law on the Title VII status

discrimination claim.

IV. New Trial IV. New Trial 

Having determined that Polaroid was entitled to

judgment as a matter of law on three of Lattimore's four claims,

we turn our attention to whether that determination requires a

-23-

new trial. We answer that question in the affirmative because it

is impossible to ascertain whether or to what extent the jury's

verdict was based on the three flawed claims.

As already noted, the only document completed by the

jury was a one page "jury questionnaire" that called upon the

jury to answer three questions. Those questions asked whether

Lattimore was harassed; whether any such harassment proximately

caused injury to him and, if so, the amount of damages to be

awarded. See Appendix A. Because the document was entitled 

"questionnaire" rather than "verdict" and because it consisted of

nothing more than "written questions susceptible of categorical

or other brief answer" (Fed. R. Civ. P. 49(a)), we view the

jury's response as a "special verdict" within the meaning of Rule

49(a).

In any event, under those circumstances, it makes

little difference whether the response is characterized as a

general or special verdict. It is settled law that, when

multiple claims are submitted to a jury and only a general

verdict is returned, a new trial is required if some of the

claims should not have been submitted and the jury's

consideration of those claims may have affected the verdict.

Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 

370 U.S. 19, 29-30, 82 S. Ct. 1130, 1136 (1962); see also Brochu 

v. Ortho Pharmaceutical, 642 F.2d 652, 662 (1st Cir. 1981).  

Although we know of no authority directly on point, we hold that

this principle is equally applicable to special verdicts. A new

-24-

trial ordinarily is required when a special verdict finding

encompasses multiple facts and claims some of which should not

have been submitted to the jury. In either case, it is

impossible to tell whether consideration of the improperly

submitted claims may have affected the verdict.

In this case, we believe the jury's verdict may have

been affected by its consideration of the erroneously submitted

claims. If the finding that Lattimore was "harassed" is

construed to mean that the jury found for Lattimore solely on the

basis of the harassment claims, the verdict was based entirely on

those claims. Alternatively, if the finding of "harassment"

resulted from consideration of both the harassment and the job

status discrimination claims,3 there is no way to determine

whether or to what extent the harassment claims affected the

verdict. In either case, a new trial is required.

Conclusion Conclusion 

For all of the foregoing reasons we vacate the judgment

entered by the District Court, reverse in part and remand the

case for a new trial with respect to the job status

discrimination claim asserted pursuant to Chapter 151B.

Reversed in part, vacated in part and remanded. No 

costs. 

 

3 The evidence presented related to both the harassment and job
status discrimination claims and both types of claims were the
subject of counsels' arguments and the court's charge.

-25-

"Concurrence Follows"

-26-

SELYA, Circuit Judge (concurring). I join fully in SELYA, Circuit Judge (concurring). 

Judge Torres' comprehensive opinion. It is, however, unfortunate

that neither attorney suggested that the verdict form require the

jury to report the results of its deliberations count by count.

Though, ordinarily, little can be gained by crying over spilt

milk, past mistakes sometimes teach valuable lessons. Thus, I

write separately to emphasize, for the benefit of the trial bench

and bar in days to come, that the need for retrial may well have

been avoided in this instance by the simple expedient of taking a

separate verdict on each statement of claim. I commend that 

practice to district judges in future multi-count cases.

-27-