**William H. RODGERS, Jr., Plaintiff-Appellant,**

v.

**FEDERAL TRADE COMMISSION, Defendant-Appellee.**

No. 71-2859.

United States Court of Appeals, Ninth Circuit.

Feb. 25, 1974.

William H. Rodgers, Jr., in pro per.

Harold D. Rhynedance, Jr., Asst. Gen. Counsel (argued), Nicholas S. Reynolds (on the brief), Robert E. Duncan, Federal Trade Commission, Washington, D. C., Stan Pitkin, U. S. Atty., Albert E. Stephan, Asst. U. S. Atty., Seattle, Wash., for defendant-appellee.

Before: KOELSCH and TRASK, Circuit Judges, and JAMESON,* District Judge.

PER CURIAM:

William H. Rodgers, Jr., an assistant professor of law at the University of Washington School of Law, appeals from a final judgment of the United States District Court that dismissed his complaint for a declaratory judgment and equitable relief in a proceeding which had originated before the Federal Trade Commission (Commission). The judgment was pursuant to a motion to dismiss filed by the Commission.

This litigation is an outgrowth of a proposal which was taken to the voters

* Honorable William J. Jameson, Senior United States District Judge, from the District of Montana, sitting by designation.

of the State of Washington as Initiative 256, an "anti-litter" measure. If adopted, it would have forbidden the sale in Washington of beer and soft drinks in containers not having a refund value of at least five cents. It was rejected by the voters on November 3, 1970, by a margin of 51 percent to 49 percent. By letter dated December 11, 1970, appellant wrote to the Secretary of appellee Federal Trade Commission, and requested that the Commission investigate what appellant described as "unfair and deceptive practices in commerce" arising out of that campaign.

The letter with documentation attached set forth the "facts upon which allegations are based." [1] Appellant's letter then concluded that on the basis of those alleged facts the Commission could find that the opponents of the initiative measure had combined "in both vertical and horizontal agreements, to make price representations to the public that constituted unfair and deceptive trade practices."

On January 26, 1971, Mr. Charles A. Tobin, the Secretary of the Commission, responded to appellant's letter and stated that the Commission found no actionable violation "even assuming a wrongful motive, for purposes of consideration of your complaint, and the willful use of distortion or deception."

With administrative relief denied, the appellant, repeating and embellishng the allegations in his earlier letter,[2] filed an action against the Commission in the District Court on April 8, 1971.

The complaint requested a judgment ordering the Commission to undertake an investigation under what it alleged was a correct interpretation of the law and asked for a declaration that the practices which the plaintiff described were violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and of the Sherman Act, 15 U.S.C. § 1 et seq. After oral argument upon the memoranda filed, the District Court denied appellant's motion for summary judgment and granted the Commission's motion to dismiss upon the grounds (1) that it was a matter committed to the discretion of the Federal Trade Commission; and (2) that the action was barred by the Supreme Court's decision in Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Assuming without deciding that the decision of the Commission in this case is reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, we go directly to the merits of appellant's claim. The Federal Trade Commission, in rejecting his contentions, pointed out that although this was not activity de-

---

1. "Simply stated, the illegality here alleged is that the grocery chain stores and the manufacturers of beer and soft drink combined, in both vertical and horizontal agreements, to make price representations to the public that constituted unfair and deceptive trade practices. At times these representations were made through the coordinating medium of Citizens Committee Against 256, at times they were made directly—for example, through the use of the stickers promising price increases. No doubt exists that if these dire threats to raise prices were implemented in a joint move by the affected industries after passage of the initiative a prima facie case of price fixing would be established. No less a violation has occurred when the industries join together with a threat of price increases to coerce the consumer to reject a ballot proposition. What happened was that the manufacturers and chains, in the course of the campaign, announced a joint price move to take effect after the election and upon the condition of the passage of 256. Saying that there is an agreement to fix prices established the violation. If there was no agreement, then the representation was false and unlawful on that separate ground. My own view is that the agreement was proven by the concerted, massive and planned move to threaten the consumer with a . . . 48 cent increase for each six-pack of a number of different products." C.T. at 35.

2. Appellant in his brief stated that in making his allegations in his complaint he had "repeated and refined" the allegations that were made to the Federal Trade Commission. Among the "refinements" was an allegation not made to the Federal Trade Commission that the conspiracy "was accomplished in part in violation of Washington State law which forbids corporations with a majority of out-of-state shareholders from making contributions in local initiative campaigns."

signed to influence a legislative body, the people, acting directly through either the initiative or referendum, are exercising the same power of sovereignty as that exercised by the legislature in passing laws. The Washington courts have so held:

"In this case we have, instead of statute, an initiative measure limiting the taxing power. That, however, can make no difference, for the latter is as much a legislative act as is the former. By Article 2, § 1, Amendment 7 to the state Constitution, it is provided that the legislative authority of the state shall be vested in the Legislature, with an express reservation in the people of the power to propose bills and laws and to enact or reject the same at the polls. The first power so reserved is the initiative. The passage of an initiative measure as a law is the exercise of the same power of sovereignty as that exercised by the Legislature in the passage of a statute." Love v. King County, 181 Wash. 462, 44 P.2d 175, 178 (1935).

The Commission noted:

"The proscriptions of Section 5 of the FTC Act, as we view them, like the proscriptions of the Sherman Act, are tailored for the business world, not for the political arena. We fail to perceive in the allegations any situation involving unfair methods of competition or business combination characterized by express or implied agreement or understanding that the participants will jointly give up their trade freedom, or undertake to take away the trade freedom of others. The cited representations, even if jointly made, alluding to higher prices, increased costs, economic hardships, and the like, which would assertedly be occasioned by passage of the subject legislative measure, appear to us to have been, at most, joint efforts to influence legislation.

"Even assuming a wrongful motive, for purposes of consideration of your complaint, and the willful use of distortion or deception, it is our view that actionable violation of Section 5 of the FTC Act is not indicated due to the overriding public interest in preservation of uninhibited communication in connection with political activity, particularly in connection with legislative processes. Nor would illegality attach because joint action may have been here undertaken on the premise of economic advantage, not merely political interest." Letter of Charles A. Tobin, Secretary, Federal Trade Commission, to William H. Rodgers, Jr., Jan. 26, 1971, in Brief of Appellant, Appendix at 10, 11–12.

The Commission then decided that action on the complaint of appellant under the Federal Trade Commission Act was not warranted. It relied upon Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 139, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Appellant strenuously argues that the Commission and the District Court which reviewed the Commission's order incorrectly construed the reach of the *Noerr* doctrine. He places the issue which he raises in perspective by stating in his opening brief:

"[I]t is urged on this appeal that the allegations to the FTC make out a case of overwhelming political influence in bringing about anti-competitive results from governmental action so complete and so thorough as to constitute an illegal instance of monopolization under the antitrust laws. Insofar as appellant is aware, this issue is being presented to an appellate court for the first time. The case presents an appealing occasion for application of the laws against monopoly to political campaigns." Brief of Appellant at 6.

Whatever appeal the facts of this case hold out to appellant, we have neither the inclination nor the authority to discard the rationale and the decision of the Supreme Court in *Noerr*. That case, upon which the Federal Trade Commission and the District Court principally relied, was a private antitrust action by the motor truck operators against the

railroads. The substance of the Sherman Act violation charged was that the rail carriers had mounted a far reaching and "vicious, corrupt and fraudulent" publicity campaign against the truckers which was designed to foster the adoption and retention of laws and law enforcement practices intended to damage and destroy the truckers as competitors. The Court held that the Sherman Act did not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws. A contrary holding, said the Court, would impute to the Sherman Act a purpose to regulate not business activity but political activity, a purpose which would have no basis in its legislative history. Such a construction would also interfere with the right to petition.

Said the Court:

"Indeed, it is quite probably people with just such a hope of personal advantage who provide much of the information upon which governments must act. A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them. We reject such a construction of the Act and hold that, at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." 365 U.S. at 139–140, 81 S.Ct. at 530–531.

*Noerr* was followed a few years later by United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). There the unlawful conspiracy alleged was one between mine owners and unions to cause the Secretary of Labor to establish unreasonably high wages

to force the complainant out of business. Thus the improper influence was not to cause passage of legislation but to cause executive action. The Court upheld the position it had announced in *Noerr:*

"Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.

More recently California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), reaffirmed the rationale of *Noerr* and of *Pennington.* That case, however, involved allegations that the conspiracy was to deter the competitors in their use of administrative and judicial proceedings so as to deny them the right to free and unlimited access to those tribunals. The result would be to discourage and ultimately prevent the competitors from invoking the processes of the administrative and judicial tribunals. This, the Court said, could bring the situation within the "sham" exception of *Noerr* which would apply where the activity complained about is a mere screen for what in fact is an attempt to interfere with the business relationships of a competitor. Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed. 2d 464 (1961).

Neither *Trucking Unlimited* nor *Pennington* lends support to appellant's arguments here. Both the supporters of Initiative 256 and its opponents had equal right to submit their arguments to the electorate at large. No charge is made of interference with voters at the polls or any infirmity in the election tabulation. The arguments of appellant fall directly within the rule of *Noerr* and the cases following it. Cases relied upon by appellant such as Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th Cir. 1969), and Harman v. Valley

National Bank, 339 F.2d 564 (9th Cir. 1964), are not apposite.[3]

One other argument that appellant made orally was that Washington State law was violated because that law "forbids corporations with a majority of out-of-state shareholders from making contributions in local initiative campaigns." No such charge was made in the complaint to the Federal Trade Commission except as it was referred to in "an unpublished draft of a paper describing the initiative campaign which I have prepared for possible publication." An examination of this document fails to disclose any direct charge of violation of Washington State law[4] and no facts were submitted to the Commission which would support any charge of illegality.

An examination of the complaint filed indicates that there was nothing before the trial court which would require it to engage in a substantial inquiry. Taking the letter presented to it and the exhibits attached, the issue was whether *Noerr* controlled or, at the most, whether the allegations presented a matter within the *Noerr* exception. We believe that the Commission acted within the scope of its authority and that its action was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C); *see* Citizens to Preserve Overton Park,

Inc. v. Volpe, 401 U.S. 402, 415–416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The trial court correctly decided the issue and its decision is affirmed.

---

3. *Sun Valley* and *Harman* involved the possible loss of antitrust immunity, relative to a concerted attempt to influence executive action, since the official whose favorable decision was sought was himself alleged to be acting unlawfully, *i. e.*, as a member of the conspiracy. Similarly, the result in this case is not controlled by Sacramento Coca-Cola Bottling Co. v. Chauffeurs Local 150, 440 F.2d 1096 (9th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971). In that case, which also involved administrative decisionmaking, the *Noerr* exemption was held inapplicable because the defendants sought to influence "public officials engaged in purely commercial dealings" and employed tactics including "threats and other coercive measures." 440 F.2d at 1099. Neither condition is satisfied here.

Appellant's reliance upon Israel v. Baxter Labs, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272 (1972), and Semke v. Enid Automobile

Dealers Ass'n, 456 F.2d 1361 (10th Cir. 1972), is also misplaced. Each of these cases involved alleged attempts to misuse administrative processes in order to further primary anticompetitive objectives. Such activity, if proved, would fall within the "sham" exception of *Noerr* as interpreted by the Court in *Trucking Unlimited*. 404 U.S. at 515–516, 92 S.Ct. 609. The case before us here, however, is distinguishable in two respects. First, the allegedly unethical conduct of the "conspirators" herein occurred solely within the "political arena," not within an administrative or judicial context. *See Trucking Unlimited supra*, at 513, 516, 92 S.Ct. 609. Secondly, the materials brought to the attention of the Commission did not indicate that the opponents of Initiative 256 had acted primarily to attain anticompetitive goals or that their actions had resulted in an abuse of the initiative proceedings.

4. C.T. at 14–15.