# United States Court of Appeals
## For the First Circuit

No. 99-2172

DAVRIC MAINE CORPORATION,

Plaintiff, Appellant,

v.

CRAIG J. RANCOURT; IVAL R. CIANCHETTE; JOSEPH M. MOLNAR;
WILLIAM FAUCHER; KEN RONCO; AND EDWARD S. MACCOLL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Circuit Judge,
Cyr, Senior Circuit Judge,
and Stahl, Circuit Judge.

John S. Campbell, with whom Campbell & McArdle, P.A., was
on brief for appellant.
Peter W. Culley, with whom Catherine R. Connors, Christopher
T. Roach, and Pierce Atwood, were on brief for appellee
Cianchette.
Julian L. Sweet, with whom Berman & Simmons, P.A., was on
brief for appellee Faucher.
Randall B. Weill, with whom Preti, Flaherty, Beliveau,
Pachios & Haley, LLC, were on brief for appellee Rancourt.

**STAHL, <u>Circuit Judge</u>**. Plaintiff-appellant Davric Maine Corporation ("Davric") seeks to overturn a grant of summary judgment in favor of defendants-appellees Craig Rancourt, Ival R. Cianchette, and William Faucher (the "defendants").[1] Davric contends that a fact-finder reasonably could conclude that the defendants violated federal and state antitrust laws and tortiously interfered with its contractual relations. We affirm.

## <u>Background</u>

Joseph J. Ricci owns a holding company which owns Davric. Davric, in turn, owns and operates Scarborough Downs ("Scarborough"), a harness racetrack in Scarborough, Maine. Scarborough hosts races, which attract horses and gamblers from Maine and other states, and also simulcasts other tracks' races. The facility is subject to regulation by Maine's Harness Racing Commission (the "Commission").

Davric alleges that in 1994, several individuals, including defendants Cianchette, Faucher, and Rancourt,

---

[1]Two other individuals were named as defendants and granted summary judgment, but Davric's appeal as to these defendants has been dismissed with prejudice.

conspired to destroy Scarborough's business in order to establish a new dominant track or to facilitate a takeover of Scarborough. Cianchette owned a stake in the only other racetrack in Maine, Faucher was Director of Operations for Foxboro Park in Massachusetts, and Rancourt was an attorney who represented the Maine Harness Horsemen's Association ("MHHA") in dealings with Scarborough. The MHHA, as well as the New England Harness Horsemen's Association ("NEHHA"), supplied the horses that raced at Scarborough.

Though we believe that summary judgment in the defendants' favor was fully warranted, we review Davric's record evidence, as we must, in the light most favorable to it. The following inferences are supportable: In 1994, the defendants agreed that they would act in concert to undermine Scarborough's business and to wrest control of harness racing in southern Maine from Davric. In early 1994, defendant Faucher spoke of these efforts with Lou Giuliano, the president of the NEHHA, and solicited Giuliano's help.[2] Faucher informed Giuliano that he

[2]The lower court excluded from its consideration much of the evidence regarding Faucher's statements to Giuliano, on the ground that this evidence, which was presented via Giuliano's affidavit and deposition testimony, constituted hearsay. We think it is clear that a defendant's own alleged statements to Giuliano were admissible against that defendant; if made, they were classic admissions and are excepted from the hearsay rule. To simplify this appeal, we will assume arguendo that each defendant's statements were admissible against all of the

and several partners intended to bring about the foreclosure of a mortgage Ricci had taken on Scarborough. Some time later, Faucher told Giuliano that this plan had failed,[3] and that the anti-Davric group now planned either (1) to persuade the Commission to deny race dates to Scarborough or (2) to "bury [Ricci] in the [Maine] legislature." According to Giuliano, after this conversation, he also "understood" that Faucher intended the MHHA to be able to prevent its members from supplying horses to Scarborough without other organizations, such as the NEHHA, filling the resulting void.[4]

Giuliano opted not to participate in the defendants' plans. Representing the MHHA at a public hearing in late 1994, Rancourt urged that Scarborough be denied racing dates for 1995. The NEHHA did not follow the MHHA's lead, and Giuliano in fact testified in favor of race dates for Scarborough. Rancourt, Cianchette and Faucher all attended this hearing. Immediately following the hearing, Rancourt and Giuliano became involved in

---

defendants, though this is a much more debatable question.

[3]As discussed below, there is no evidence that any party ever attempted to implement a plan to secure foreclosure of Scarborough's mortgage.

[4]Giuliano's affidavit does not state that Faucher told him that his confederates actually intended to employ such a stranglehold. Rather, the affidavit attests only to the inference Giuliano drew from the conversation.

a verbal altercation concerning Giuliano's testimony favorable to Davric.[5]

In June or July of 1996, approximately two years after the conversations between Faucher and Giuliano, MHHA leaders apparently tried to force member horsemen to boycott Scarborough.[6]  As a result, for several days, Davric ran fewer races than it ordinarily would have run.

In March 1997, the MHHA's Executive Secretary, Ken Ronco, was served with notice to vacate the association's offices at Scarborough, despite a 1996 contract requiring Davric to provide the MHHA with office space there.  Rancourt subsequently filed suit against Davric on behalf of the MHHA, alleging wrongful eviction, conversion of MHHA property, and assault against Ronco.  The wrongful eviction and conversion claims were submitted to arbitration pursuant to the 1996 contract, and the arbitrator found in favor of the MHHA.  The evidence suggests that the assault claim remains pending.

Davric's summary judgment evidence further suggests that the defendants have continued to pursue business interests

---

[5]Davric was granted racing dates, but as a condition, the Commission imposed restrictions on Ricci's involvement with Scarborough's management.

[6]No evidence presented, however, links this "boycott" to any Scarborough competitor.

adverse to Davric's in furtherance of the purported conspiracy. For instance during 1994, Cianchette apparently negotiated with third parties to establish a new racing location in Southern Maine. In 1997, Rancourt urged horsemen to frequent racetracks other than Scarborough. That year, with Rancourt's help, the MHHA formed a "Steering Committee" to investigate opportunities for establishing a competitor track. Faucher was named to the committee, as was Cianchette's son. Rancourt then proposed to the Maine legislature measures designed to facilitate the formation of the new track. Later in 1997, these efforts resulted in the enactment of such legislation.

On June 24, 1998, based on the foregoing claims, Davric filed suit in federal district court against Rancourt, Cianchette, Faucher, Joseph M. Molnar, and Ken Ronco. Davric charged that the defendants had violated federal and state antitrust laws and tortiously interfered with Davric's contractual relations. The defendants moved for summary judgment on all counts. A magistrate judge recommended that summary judgment be granted, and the district court concurred. Davric appeals.

## Discussion

We review the grant of summary judgment de novo, construing the record in the light most favorable to Davric and

resolving all reasonable inferences in its favor.  See Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  Summary judgment is appropriate if Davric's evidence is "merely colorable, or is not significantly probative" to conjure a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).  We will not "accept [Davric's] subjective characterizations of events, unless the underlying events themselves are revealed."  Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 50 (1st Cir. 1999); see also Liberty Lobby, 477 U.S. at 256; Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 (1st Cir. 1998).

I.  Federal Antitrust Claims

Davric alleges, first, that the defendants' actions violated section one of the Sherman Antitrust Act, 15 U.S.C. § 1.  In support of this claim, Davric targets three classes of behavior, which we address in turn.

A.      The Scarborough "Boycott"

The heart of Davric's claim is its contention that Rancourt, Faucher, and Cianchette organized a boycott against Scarborough.  The parties dispute whether such a boycott would be per se invalid or subject to rule of reason review, see Northwest Wholesale Stationers v. Pacific Stationery & Printing

Co., 472 U.S. 284, 298 (1985); Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 212 (1959), but we need not address this issue of antitrust law. Whichever standard obtains, Davric has failed to submit adequate evidence to establish a genuine issue of material fact.

The evidence regarding the MHHA boycott is presented almost entirely via the affidavits submitted by Giuliano and several MHHA horsemen. Giuliano testified as follows: In early 1994, Faucher approached him and described various means whereby Faucher, Cianchette, and several partners planned to wrest control of Scarborough from Ricci. Faucher later informed Giuliano that Cianchette had connections with the MHHA. After what appears to have been a third conversation, during the summer of 1994, Giuliano "understood that [Faucher] wanted the MHHA to be able to cut off its members from supplying horses [to Scarborough] without the risk that the lack of horses could be made up through other horses which could have been brought . . . by the [NEHHA]" (emphasis added).

The remaining evidence is derived from the horsemen's affidavits: In late June or early July, 1996 -- some two years after the conversations just described -- several MHHA members noticed activity which suggested to them that certain MHHA leaders were trying to implement a boycott of Scarborough.

-8-

Stanley Whittemore and Gary Mosher, two trainers with the MHHA, apparently asked various MHHA members to keep their horses out of Scarborough races. But the horsemen's testimony regarding the boycott does not in any way suggest that anyone other than horsemen members of the MHHA was involved.

In light of the record evidence, there is no genuine issue of fact regarding a conspiracy among Davric's competitors to withhold horses from Scarborough. Davric can show only that Giuliano thought that Faucher would have liked to engineer a boycott in 1994 and that the MHHA tried to impose one on its own in 1996. Davric thus has provided insufficient evidence of a link between the defendants and the MHHA's actions in 1996. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252 (citations omitted). Here, there is no such evidence, and summary judgment was proper.

B.    Defendants' Activities Before the Commission, the Legislature, and the Courts

Davric also alleges that the defendants' efforts before the Commission, the Maine Legislature, and the courts are actionable under federal and state antitrust law. These endeavors, however, are protected by the Noerr-Pennington

antitrust immunity doctrine.  That doctrine, which derives from the First Amendment's guarantee of "the right . . . to petition the government for redress of grievances," U.S. Const. amend. I, shields from antitrust liability entities who join together to influence government action -- even if they seek to restrain competition or to damage competitors.  See, e.g., United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965); Eastern R.R. Conference v. Noerr Motor Freight, 365 U.S. 127, 135-38 (1961); Sandy River Nursing Care v. Aetna Cas., 985 F.2d 1138, 1141 (1st Cir. 1993).  The doctrine applies to "petitions" before legislatures, administrative agencies, and courts.  See, e.g., Otter Tail Power Co. v. United States, 410 U.S. 366, 379-80 (1973); California Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).  Even false statements presented to support such petitions are protected.  See, e.g., Pennington, 381 U.S. at 670.

Davric seeks refuge in the Noerr-Pennington doctrine's "sham" exception, which exempts a party's resort to governmental process from antitrust immunity when such resort is objectively baseless and intended only to burden a rival with the governmental decision-making process itself.  See, e.g., City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380 (1991). But this exception is unavailable here, because it only

"encompasses situations in which persons use the governmental process -- as opposed to the outcome of that process -- as an anticompetitive weapon." Id.; see also Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993). Moreover, "a successful 'effort to influence governmental action . . . certainly cannot be characterized as a sham.'" Id. at 58 (quoting Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 502 (1988)) (alteration in original).

In this case, it is apparent that the defendants sought to benefit from the outcomes of the processes at issue and that, in any case, they cannot be considered "objectively baseless." First, the defendants' efforts to lobby the Commission and the legislature were, in part, successful. They therefore cannot be considered shams, and are immune from federal or state antitrust scrutiny.[7] The litigation arising out of Davric's expulsion of

---

[7]Courts have differed as to whether the Noerr-Pennington doctrine is a creature of the First Amendment, in which case it would apply of its own force to state antitrust claims, or whether it instead constitutes a mere interpretation of the Sherman Act, in which case it would not necessarily apply to state antitrust statutes that failed to mirror their federal counterparts. Compare Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir. 1999) (firmly establishing Noerr-Pennington as an outgrowth of the First Amendment), and Kottle v. Northwest Kidney Ctrs., 146 F.3d 1056, 1059 (9th Cir. 1998) (same), with Cardtoons, L.C. v. Major League Baseball Players Assoc., 208 F.3d 885, 890 (10th Cir. 2000) ("Antitrust cases that grant Noerr-Pennington immunity do so based upon both the Sherman Act

the MHHA from Scarborough also satisfies the requirements for Noerr-Pennington immunity. "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation," and such probable cause "requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." Professional Real Estate Investors, 508 U.S. at 62-63. Davric cannot prove that the MHHA or Ronco lacked such a reasonable belief. As noted above, an arbitrator who heard all but one of the claims against Davric found Davric liable on each of the claims it adjudicated, demonstrating that they were hardly baseless. The remaining charge -- alleging assault against Ronco -- is apparently still pending, but in light of the evidence presented regarding the details of Ronco's expulsion from Scarborough, we believe that Ronco, the MHHA, and Rancourt certainly could have harbored a reasonable expectation

---

and the right to petition."), and Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1364-65 (5th Cir. 1983) ("Noerr was based on a construction of the Sherman Act. It was not a first amendment decision."). We need not address this controversy because "Maine antitrust statutes parallel the Sherman Act" and are analyzed pursuant to federal antitrust doctrine. Tri-State Rubbish, Inc. v. Waste Management, Inc., 998 F.2d 1073, 1081 (1st Cir. 1993). Thus, regardless of whether the Noerr-Pennington protections are constitutional or statutory in nature, they will apply with equal force to Davric's claims under state and federal antitrust law.

of success on the merits of that charge.  The MHHA litigation, therefore, also is immune from antitrust scrutiny.[8]

### C. Defendants' Attempts To Secure Foreclosure on Ricci's Mortgage

Davric also argues that the defendants' attempt to take advantage of contacts with Ricci's banker to effect a foreclosure on the Scarborough mortgage constituted an actionable violation of antitrust law.  Like the district court, we see inadequate evidence to support this contention.

To prevail with respect to this claim, Davric would have to demonstrate that it suffered antitrust injury as a result of the defendants' attempt to have the mortgage foreclosed.  See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 484-89 (1977); Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 752 (1st Cir. 1994); CVD,

---

[8]Davric's papers also allude to a separate suit in which Rancourt represented a creditor of Giuliano's.  It is unclear how  litigation against Giuliano, who is not a party to this case, could ground an antitrust claim set forth by Davric alone, but even if it could, this litigation is also protected by Noerr-Pennington.  As Giuliano concedes, that suit resulted in a judgment against him.  It thus does not matter whether, as Davric suggests, Rancourt pursued the matter more vigorously than he otherwise might have due to animosity toward Giuliano. Cf. City of Columbia, 499 U.S. at 380 (labeling a party's motives in pursuing petition "irrelevant").  The successful litigation did not lack an objective basis, and therefore was not a sham under Noerr-Pennington.  See, e.g., Professional Real Estate Investors, 508 U.S. at 60 ("Only if a challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.").

Inc. v. Raytheon Co., 769 F.2d 842, 857-58 (1st Cir. 1985). But Davric appears unable to demonstrate any injury at all. According to Davric's own evidence -- presented in Giuliano's affidavit -- Faucher told Giuliano that the planned attempt to force a foreclosure had failed. Davric submitted no evidence of any actual foreclosure. Indeed, Ricci admitted at his deposition that he had not even approached Key Bank to determine whether any attempt ever actually was made to effect a foreclosure. Further, at his deposition, Cianchette denied ever discussing Ricci or Scarborough with Key Bank personnel. In the absence of any antitrust injury stemming from the defendants' purported attempt to have the Key Bank foreclose on the track's mortgage, summary judgment on this claim was appropriate.

II. Maine Antitrust Claims

Davric also claims that the defendants violated Maine's antitrust laws. See Me. Rev. Stat. Ann. tit. 10, § 1101 et seq. The Maine statute prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce," id. § 1101, and provides that "[w]hoever shall monopolize or attempt to monopolize or combine or conspire with any other person or

persons to monopolize any part of the trade or commerce of this State shall be guilty of a Class C crime," id. § 1102.[9]

As described at length above, Davric cannot prevail on its conspiracy-based claims. Davric's flawed arguments concerning the alleged boycott, the defendants' attempts to interfere with Scarborough's mortgage, and their efforts before the Commission, the Maine legislature, and the courts similarly doom any recovery under Me. Rev. Stat. Ann. tit. 10, § 1101. Moreover, Davric concedes that the defendants have not actually monopolized its market pursuant to § 1102. In fact, Davric's brief strongly suggests that it remains the dominant player in the appropriate market:

> Of the $18 million wagered on live racing in Maine in 1993, $10.8 million was wagered at Scarborough Downs. No other facilities offer the racing opportunities and purses available at Scarborough Downs. For decades, Scarborough Downs had been the principal extended racing meet in the State of Maine and since the late 1980s it had been the only such facility in Central or Southern Maine.

Further, as Davric notes, "a new track would first have to operate for two consecutive years in order to qualify for a share of the off-track betting . . . revenue."

---

[9]Despite the use of the word "crime," the Maine statute explicitly permits "any person" to seek redress for a violation. See Me. Rev. Stat. Ann. tit. 10, § 1104.

The only remaining question, then, is whether Davric can demonstrate that the defendants attempted to monopolize any particular market. We have noted that the "Maine antitrust statutes parallel the Sherman Act," and thus have analyzed claims thereunder according to the doctrines developed in relation to federal law. Tri-State Rubbish, Inc. v. Waste Management, Inc., 998 F.2d 1073, 1081 (1st Cir. 1993). Those doctrines justify summary judgment in this case. "[A] plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455 (1993) (emphasis added); see also Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 107-08 (1st Cir. 1997) (recognizing requirement that plaintiff who alleges attempted monopolization must demonstrate defendant's market power and "dangerous probability of success"); George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 550 (1st Cir. 1974) ("[W]e . . . think that [an attempted monopolization] case, like a monopolization case, requires a definition of the relevant market."). Davric, however, has failed to set forth any evidence establishing power in any particular geographic or product-based market, and certainly has

-16-

not produced evidence suggesting a "dangerous probability" of monopolization. On the contrary, the most Davric can show is that for a period of several days, it was forced to run fewer races than it otherwise would have. Because Davric has provided not even "a scintilla of evidence in support of [its] position," Liberty Lobby, 477 U.S. at 252, summary judgment on its attempted monopolization claim was proper.

III. Tortious Interference Claims

Finally, Davric contends that a jury might have found that the defendants tortiously interfered with relations both between Davric and the horsemen and between Davric and administrative authorities. In Maine, "[i]nterference with an advantageous relationship requires the existence of a valid contract or prospective economic advantage, interference with that contract or advantage through fraud or intimidation, and damages proximately caused by the interference." Barnes v. Zappia, 658 A.2d 1086, 1090 (Me. 1995); see also DiPietro v. Casco N. Bank, 490 A.2d 215, 219 (Me. 1985); MacKerron v. Madura, 445 A.2d 680, 683 (Me. 1982); Harmon v. Harmon, 404 A.2d 1020, 1025 (Me. 1979).

Davric's assertion of tortious interference cannot survive summary judgment. Although Davric declares conclusorily that the defendants impeded its relationship with "horsemen and

-17-

horsemen groups" and with the Commission, it nowhere explains specifically how the defendants' conduct affected those relationships. It has produced no evidence of fraud or intimidation directed at either the MHHA or the Commission, and while it claims that the defendants attempted to intimidate NEHHA president Giuliano, it concedes that Giuliano refused to alter that organization's relationship with Scarborough. This concession precludes the requisite showing of damages. All Davric has provided us with, then, is innuendo and conjecture. As noted above, we will not "accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed." <u>Simas</u>, 170 F.3d at 50. Summary judgment therefore was appropriate with regard to Davric's tortious interference claims.

## <u>Conclusion</u>

For the foregoing reasons, we **<u>AFFIRM</u>**.