Carroll
No. 2008-723

## GREEN MOUNTAIN REALTY CORPORATION

### v.

## THE FIFTH ESTATE TOWER, LLC & a.

Argued: September 8, 2010
Opinion Issued: November 10, 2010

*Donahue Tucker & Ciandella PLLC*, of Exeter (*Robert M. Derosier* and *Keriann Roman* on the brief, and *Robert D. Ciandella* orally), for the plaintiff.

*D'Amante Couser Steiner Pellerin, P.A.*, of Concord (*Roy S. McCandless* on the brief), *Orr & Reno, P.A.*, of Concord (*William L. Chapman* on the

brief and orally), *Haughey, Philpot & Laurent, P.A.*, of Laconia (*William Philpot, Jr.* on the brief), and *McCormick, Fitzpatrick, Kasper & Burchard, P.C.*, of Burlington, Vermont (*Thomas P. Simon* on the brief), for the defendants.

*Stephen M. Hoersting*, of Alexandria, Virginia, on the brief, and *Wadleigh, Starr & Peters, PLLC*, of Manchester (*Dean B. Eggert* and *Michael J. Tierney* on the brief), for Center for Competitive Politics, as *amicus curiae*.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Matthew R. Johnson* and *Joshua M. Wyatt* on the brief), for The New Hampshire Association of Realtors, as *amicus curiae*.

*Barbara Keshen*, of Concord, by brief, for New Hampshire Civil Liberties Union, as *amicus curiae*.

*Ben Robbins* and *Martin J. Newhouse*, of Boston, Massachusetts, on the brief, and *Devine, Millimet & Branch, P.A.*, of Manchester (*Matthew R. Johnson* on the brief), for New England Legal Foundation, as *amicus curiae*.

*St. Hilaire & St. Hilaire, PLLC*, of Concord (*Daniel St. Hilaire* on the brief), and *Robert M. O'Neil & a.*, of Charlottesville, Virginia, on the brief, for The Thomas Jefferson Center for the Protection of Free Expression, as *amicus curiae*.

DALIANIS, J. The defendants, The Fifth Estate Tower, LLC and Jay Williams, individually and in his official capacity as manager of The Fifth Estate Tower, LLC (collectively, Fifth Estate), appeal a $6.7 million jury verdict in favor of the plaintiff, Green Mountain Realty Corporation (Green Mountain), on its claim that Fifth Estate violated the New Hampshire Consumer Protection Act (CPA), *see* RSA ch. 358-A (2009). Fifth Estate argues that the Superior Court (*Fitzgerald*, J.) erred by denying its summary judgment motion and motions for directed verdict and judgment notwithstanding verdict (JNOV). We reverse.

*I. Background*

The record evidences the following facts. Green Mountain and Fifth Estate both site, construct, own and operate personal wireless service facilities. This case arises out of a series of postcards that Fifth Estate designed, printed and distributed, which included statements that Green Mountain claims were misleading and/or false. The postcards were distributed to the general electorate of the town of Wolfeboro in connection with

a September 2005 special town meeting involving two warrant articles. The warrant articles asked whether town voters would authorize the town's board of selectmen to enter into long-term leases with Green Mountain, which would enable it to construct a radio communications tower on town property known as Poor Farm Hill and install radio communications antennas at the site of the town's existing water tank.

The postcards urged town voters to vote against the two warrant articles because the town did not need "to get better cellular service or emergency services" as it "already [had] existing structures to handle both." The postcards referred to the proposed communications tower as an "[e]yesore" and unnecessary, and to the proposed leases as "no-bid, 30-year, [and] non-cancellable." The postcards also told voters that they could save the view of the lake from the town docks "[a]nd get complete cell coverage" by voting "[n]o" on the warrant articles.

In the months preceding the special town meeting, in addition to sending the postcards, Fifth Estate ran a series of advertisements, newspaper pieces, radio announcements and mass mailings that included statements that: (1) the tower to be erected on Poor Farm Hill would destroy the town's picturesque skyline; (2) for the water tank site alone, Green Mountain would take more than $1 million from town taxpayers; (3) the tower on Poor Farm Hill was unnecessary because Fifth Estate provided "complete wireless coverage" to the town; (4) Green Mountain's personal wireless service facilities would cause town residents to suffer from cancer, Alzheimer's disease and other serious illnesses; and (5) the leases would cost town taxpayers between $200,000 and $600,000 over their respective terms.

Ultimately, the town electorate rejected both warrant articles. In January 2006, Green Mountain filed a writ against Fifth Estate alleging, among other causes of action, a claim that Fifth Estate violated the CPA because its "false and misleading statements" constituted "unfair and deceptive acts or practices."

Fifth Estate moved for summary judgment, arguing that the CPA does not apply to its conduct because it took place in a political context, rather than a commercial one, and because its statements were political speech protected by the First Amendment to the Federal Constitution and Part I, Article 22 of the New Hampshire Constitution. The trial court denied the motion, and the claim proceeded to trial. Fifth Estate raised these same arguments in its motions for directed verdict and JNOV. The trial court rejected the arguments for the reasons articulated in its order denying Fifth Estate's summary judgment motion. This appeal followed.

*II. Discussion*

Fifth Estate argues that the trial court erred when it ruled that the CPA applied to Fifth Estate's conduct. It contends that the legislature did not intend the CPA to regulate conduct occurring in a political setting, rather than in a business setting. *See Rodgers v. F.T.C.*, 492 F.2d 228, 229-32 (9th Cir.) (Federal Trade Commission Act did not apply to campaign activities of opponents to state anti-litter measure, which were directed to electorate at large), *cert. denied*, 419 U.S. 834 (1974); *O'Connor v. Superior Court (Wyman)*, 223 Cal. Rptr. 357, 360 (Ct. App.) (noting that "[f]ederal cases under the Federal Trade Commission Act and the Sherman Antitrust Act have uniformly held that the laws regulating business practices do not apply to political campaign activities"), *review denied* (Cal. 1986). To address this argument, we must interpret the CPA, which is a question of law that we review *de novo. See Laramie v. Stone*, 160 N.H. 419, 436 (2010).

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 93 (2007). When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* To interpret the CPA, the legislature has directed that we "may be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade Commission Act . . . by the Federal Trade Commission and the federal courts." RSA 358-A:13; *see State v. Moran*, 151 N.H. 450, 452-53 (2004); *see also Rousseau v. Eshleman*, 129 N.H. 306, 310 (1987) (Thayer, J., concurring) (it is proper to consult cases decided under Sherman Antitrust Act to construe the CPA because lower federal courts view the Federal Trade Commission and Sherman Acts as involving the same subject matter).

*A. CPA*

The CPA provides, in relevant part: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. After this general proscription, the CPA lists fifteen representative categories of unlawful acts that the legislature has determined constitute unfair methods of competition or unfair or deceptive acts or practices. *Simpson v. Young*, 153 N.H. 471, 476 (2006). One category of unlawful acts involves "[d]isparaging the goods, services, or business of another by false or misleading representation of fact." RSA 358-A:2, VIII; *see Mortgage*

*Specialists v. Davey*, 153 N.H. 764, 781 (2006). Other categories include "[r]epresenting that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have," RSA 358-A:2, V, and "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another," RSA 358-A:2, VII. The CPA defines "[t]rade" and "commerce" as including "advertising, offering for sale, sale, or distribution of any services and property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate." RSA 358-A:1, II. The terms also "include any trade or commerce directly or indirectly affecting the people of this state." *Id.*

For the purposes of this appeal, we assume, without deciding, that Fifth Estate's conduct constituted an unfair or deceptive practice, within the meaning of the CPA. *See* RSA 358-A:2. Nonetheless, we conclude that the CPA does not apply because Fifth Estate's conduct occurred in a political setting. *See Rodgers*, 492 F.2d at 229-32.

### B. Noerr-Pennington Doctrine

In reaching this conclusion, we rely upon the *Noerr-Pennington* doctrine, which was originally developed by the United States Supreme Court in Federal Sherman Antitrust Act (Sherman Act) cases, *see Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127 (1961); *Mine Workers v. Pennington*, 381 U.S. 657 (1965), but since has been applied to Federal Trade Commission Act cases, *see Rodgers*, 492 F.2d at 229-32, as well as to those brought under state unfair trade practices acts, *see, e.g., People ex rel. Gallegos v. Pacific Lumber*, 70 Cal. Rptr. 3d 501, 513 (Ct. App.), (applying doctrine to claim brought under California Unfair Competition Law), *review denied* (Cal. 2008). *See Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000) (noting that *Noerr-Pennington* doctrine is no longer limited to antitrust context), *cert. denied*, 532 U.S. 905 (2001); *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (same).

Under the *Noerr-Pennington* doctrine, "[c]oncerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). In *Noerr*, the Court held that the defendant railroads could associate for the purpose of waging a publicity campaign directed at the general electorate designed to secure legislation that was destructive to the truckers with whom they competed, without incurring liability under the Sherman Act. *Noerr*, 365 U.S. at 129-45; *see Sandy River Nursing Care v. Aetna Cas.*, 985 F.2d 1138, 1142 (1st Cir.), *cert. denied*, 510 U.S. 818 (1993). The railroads' publicity was designed specifically not only to foster the adoption of laws that were damaging to truckers, but also "to create an atmosphere of distaste for truckers among

the general public, and to impair the relationships existing between the truckers and their customers." *Noerr*, 365 U.S. at 129. "Interpreting the Sherman Act in light of the First Amendment's Petition Clause, the Court noted that at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 424 (1990) (quotation omitted). Even though the "sole purpose" of the railroads' campaign "was to destroy the truckers as competitors for the long-distance freight business," the court ruled that the railroads were entitled to immunity from antitrust liability for their conduct. *Noerr*, 365 U.S. at 138. Thus, under the *Noerr-Pennington* doctrine, "[a] publicity campaign directed at the general public, seeking legislation . . . enjoys antitrust immunity even when the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp.*, 486 U.S. at 499-500; *see Noerr*, 365 U.S. at 135 ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws.").

In *Pennington*, an antitrust case brought by owners of a small coal mining company against the coal miners' union, the Court reiterated: "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670. There, the alleged unlawful conspiracy was between certain large coal operators and the coal miners' union. *Id.* at 659. Among other things, the large coal operators and coal miners' union petitioned the federal Secretary of Labor to establish unreasonably high minimum wages for employees of contractors selling coal to the Tennessee Valley Authority so as to make it difficult for small coal operators, such as the complainant, to compete in the market. *Id.* at 660.

The United States Supreme Court has since extended the *Noerr-Pennington* doctrine to petitions before administrative agencies and courts. *See California Mot. Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see also Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000). Additionally, it has granted *Noerr-Pennington* immunity "to a wide range of activities in addition to traditional lobbying, including . . . sales and marketing efforts[] and court litigation." *Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 189 (S.D.N.Y. 2006) (citing cases); *see Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 373 (1991)

(granting *Noerr-Pennington* immunity to company's effort to persuade city to adopt ordinance, even though ordinance would exclude company's competitor).

At least one federal court has applied the *Noerr-Pennington* doctrine to a Federal Trade Commission Act case. *See Rodgers*, 492 F.2d at 230. *Rodgers* involved a petition for declaratory judgment and injunctive relief challenging actions taken by opponents to an anti-litter measure. *Id.* at 228-29. If adopted, that measure would have forbidden the sale of beer and soft drinks in containers not having a refund value of at least five cents. *Id.* at 229. The petitioner alleged that opponents to the measure had "combined in both vertical and horizontal agreements, to make price representations to the public that constituted unfair and deceptive trade practices" under the Federal Trade Commission Act. *Id.* (quotation omitted).

The Federal Trade Commission ruled that the opponents were entitled to *Noerr-Pennington* immunity for their alleged actions. *Id.* at 229-30. It observed that the proscriptions of the Federal Trade Commission Act, "like the proscriptions of the Sherman Act, are tailored for the business world, not for the political arena." *Id.* at 230 (quotation omitted). The opponents were entitled to *Noerr-Pennington* immunity, the commission ruled, even if they made their alleged misrepresentations willfully and with ill motive, because they made them to influence legislation. *Id.* at 229. The commission concluded: "[I]t is our view that actionable violation of . . . the FTC Act is not indicated due to the overriding public interest in preservation of uninhibited communication in connection with political activity, particularly in connection with legislative process." *Id.* at 230 (quotation omitted).

The Ninth Circuit Court of Appeals affirmed, reasoning: "Both supporters of [the] [i]nitiative . . . and its opponents had equal right to submit their arguments to the electorate at large." *Id.* at 231. As no charge was made that the measure's opponents had interfered with voters at the polls or with officials tabulating the votes, the court ruled that the opponents were entitled to *Noerr-Pennington* immunity. *Id.*

The Federal Trade Commission also has applied the *Noerr-Pennington* doctrine to Federal Trade Commission Act cases. *See, e.g., Union Oil Company of California*, 138 F.T.C. 1, 17-78 (2004), http://www.ftc.gov/os/decisions/docs/volume138.pdf (discussing application of *Noerr-Pennington* immunity to claim that Union Oil Company of California (Unocal) violated Federal Trade Commission Act through knowing and willful misrepresentations to the California Air Resources Board and competitors that Unocal lacked or would not assert patent rights concerning automobile emissions research results). Additionally, several state and federal courts have applied the *Noerr-Pennington* doctrine to cases brought under state unfair trade practices acts. *See Suburban Restoration Co., Inc. v. Acmat Corp.*,

700 F.2d 98 (2d Cir. 1983) (applying *Noerr-Pennington* to Connecticut Unfair Trade Practices Act case); *Keep Thomson, Etc. v. Citizens for Gallen Com.*, 457 F. Supp. 957, 961 (D.N.H. 1978) (applying doctrine to CPA claim); *Pacific Lumber*, 70 Cal. Rptr. 3d at 513 (applying doctrine to claim brought under California Unfair Competition Law); *cf. Zeller v. Consolini*, 758 A.2d 376, 378, 382 (Conn. App. Ct. 2000) (*Noerr-Pennington* doctrine applies to petitioning activity directed at local zoning board); *Cove Rd. Dev. v. W. Cranston Indus. Park*, 674 A.2d 1234, 1237 (R.I. 1996) (applying *Noerr-Pennington* doctrine to developer's efforts to obtain zoning relief).

For instance, in *Keep Thomson, Etc.*, the United States District Court for the District of New Hampshire ruled that *Noerr-Pennington* immunity applied to a claim that a committee seeking reelection of the incumbent governor had used a song in a political advertisement to support the incumbent's candidacy even though a committee to advance the election of another candidate claimed to own the rights to the song. *Keep Thomson, Etc.*, 457 F. Supp. at 958-59, 961. Relying upon *Rodgers*, the court concluded that the proscriptions of the CPA, like those of the Federal Trade Commission Act, were not intended for the political arena. *Id.* at 961.

The Second Circuit Court of Appeals used similar logic in *Suburban Restoration Co., Inc.*, 700 F.2d at 101-02, to interpret the Connecticut Unfair Trade Practices Act. The court reasoned that Connecticut courts would likely apply the *Noerr-Pennington* doctrine to the Connecticut statute because it was expressly modeled after the Federal Trade Commission Act and because the statute directs courts to be guided by federal interpretations of the federal act. *Suburban Restoration Co., Inc.*, 700 F.2d at 101-02. The court ruled that because the activity complained of — the filing of a single non-sham lawsuit — was entitled to *Noerr-Pennington* immunity, it could not form the basis of either a claim under the Connecticut statute or a common law claim for tortious interference with business expectancy. *Id.* at 102.

 We find the reasoning of these cases persuasive and hold that the *Noerr-Pennington* doctrine applies to claims brought under the CPA. The CPA, like the Connecticut statute at issue in *Suburban Restoration Co., Inc.*, is analogous to the Federal Trade Commission Act. *See Roberts v. General Motors Corp.*, 138 N.H. 532, 539 (1994). Our legislature, like the Connecticut legislature, has directed that we may rely upon the interpretation of the Federal Trade Commission Act by the Federal Trade Commission and federal courts. *See* RSA 358-A:13; *see also Moran*, 151 N.H. at 452-53. The CPA, like the Federal Trade Commission Act, is tailored for the business arena, not the political arena. It proscribes unfair methods of competition or unfair or deceptive acts "in the conduct of any

trade or commerce" in the state. RSA 358-A:2. "Fraudulent or deceptive conduct can be actionable under the [CPA] only if it occurs in a business setting involving the advertising or sale of a commodity or service as part of the day-to-day business of the defendant." *Brzica v. Trustees of Dartmouth College*, 147 N.H. 443, 451 (2002). Just as the *Rodgers* court and the Federal Trade Commission have ruled that the *Noerr-Pennington* doctrine applies to claims brought under the Federal Trade Commission Act, so too do we hold the *Noerr-Pennington* doctrine applies to claims brought under the CPA.

## C. Application of Noerr-Pennington Immunity to Defendants

 We next address whether Fifth Estate's conduct in this case is entitled to *Noerr-Pennington* immunity. The facts of this case mirror those in *Noerr*. In this case, as in *Noerr*, 365 U.S. at 129, at issue is a publicity campaign directed at the general electorate. Like the campaign in *Noerr*, the alleged purpose of Fifth Estate's publicity campaign was anti-competitive — here, it is to eliminate Green Mountain as a competitor. *See Noerr*, 365 U.S. at 138. Additionally, as in *Noerr*, "the publicity matter circulated in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups," when, in fact, in *Noerr*, it was paid for by the railroads and, in our case, by Fifth Estate. *Id.* at 130. Just as the *Noerr* court ruled that the railroad industry's "mere attempts to influence the passage or enforcement of laws" did not violate the Sherman Act, so too do we conclude that Fifth Estate's "mere attempts to influence" the passage of the warrant articles does not violate the CPA, even if, as Green Mountain alleges, Fifth Estate's sole motive was to eliminate Green Mountain as a competitor. *Id.* at 135, 138; *see Allied Tube & Conduit Corp.*, 486 U.S. at 499-500.

We are not persuaded by Green Mountain's assertion that the special town meeting at issue did not involve the passage or enforcement of laws. As Green Mountain acknowledges, the town of Wolfeboro has a town meeting form of government, and "[i]t is well understood that, within the limits of the power of legislation conferred upon it, a town meeting is a legislative body." *New London v. Davis*, 73 N.H. 72, 74 (1904); *see Attorney-General v. Folsom*, 69 N.H. 556, 557 (1899) ("In New England town meetings the voters are the sovereigns, and their will, when duly expressed, is supreme."). At issue here is the passage of warrant articles, which, in a town meeting, are the equivalent of legislation.

### 1. "Commercial" Exception

Green Mountain contends that Fifth Estate is not entitled to *Noerr-Pennington* immunity because of the "commercial" exception thereto,

which some courts, including the First Circuit, have recognized. *See Hecht v. Pro-Football, Inc.*, 444 F.2d 931, 940-42 (D.C. Cir. 1971), *cert. denied*, 404 U.S. 1047 (1972); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 31-34 (1st Cir.), *cert. denied*, 400 U.S. 850 (1970). *But see Greenwood Utilities v. Mississippi Power Co.*, 751 F.2d 1484, 1505 n.14 (5th Cir. 1985) (noting that "there should be no commercial exception to *Noerr-Pennington*"); *In re Airport Car Rental Antitrust Litigation*, 693 F.2d 84, 88 (9th Cir. 1982) (holding that "[t]here is no commercial exception to *Noerr-Pennington*"), *cert. denied*, 462 U.S. 1133 (1983).

The First Circuit Court of Appeals applied this exception in *Whitten*, which involved manufacturers of prefabricated pipeless pool gutters that were competing to sell their products to public bodies acting under competitive bidding procedures. *Whitten*, 424 F.2d at 27. One of the manufacturers combined with dealers and others to require the use of its own specifications in the public swimming pool industry, with the intent to exclude other manufacturers. *Id.* The court ruled that *Noerr-Pennington* immunity was unavailable to the company in part because "the efforts of an industry leader to impose his product specifications by guile, falsity, and threats on a harried architect hired by a local school board hardly rise to the dignity of an effort to influence the passage or enforcement of laws." *Id.* at 32. The court explained: "The entire thrust of *Noerr* is aimed at insuring uninhibited access to government Policy makers. . . . By 'enforcement of laws' we understand some significant policy determination in the application of a statute, not a technical decision about the best kind of weld to use in a swimming pool gutter." *Id.* The court further reasoned:

> The state legislatures, by enacting statutes requiring public bidding, have decreed that government purchases will be made according to strictly economic criteria. [While the company] is free to seek legislative change in this basic policy, . . . until such change is secured, [its] dealings with officials who administer the bid statutes should be subject to the same limitations as its dealings with private consumers.

*Id.* at 33. Thus, the court ruled that *Noerr-Pennington* immunity was unavailable when the government was:

> acting in a proprietary capacity, purchasing goods and services to satisfy its own needs within a framework of competitive bidding, where the initial responsibility for recommending specifications has been entrusted to a hired professional, and where the selling effort directed at that professional and his public client was monopolistically motivated and ran the gamut from high pressure salesmanship to fraudulent statements and threats.

*Id.* at 29.

It is unclear whether *Whitten* is still good law in the First Circuit. In *Sandy River Nursing Care*, 985 F.2d at 1143, the First Circuit may have disavowed its reasoning in *Whitten* when it observed that the United States Supreme Court in *Superior Court Trial Lawyers' Assn.*, 493 U.S. 411, did not establish a government-as-market-participant exception to *Noerr-Pennington* immunity. Moreover, other courts have suggested that when the United States Supreme Court expanded *Noerr-Pennington* immunity to petitions before administrative agencies, *see California Mot. Transport*, 404 U.S. at 510, it implicitly overruled *Whitten. See In re Airport Car Rental Antitrust Litigation*, 693 F.2d at 88; *Bustop Shelters v. Convenience & Safety Corp.*, 521 F. Supp. 989, 996 (S.D.N.Y. 1981) (*Whitten* "ha[s] been disapproved in this circuit, as implicitly overruled or weakened by *California Motor Transport.*").

■ Even if we assume that *Whitten* is still good law and that we would follow it in construing the CPA, it is factually distinguishable from the instant case. *Whitten* "involved direct commercial competitors attempting to sell their products to public bodies under competitive bidding procedures." *Council for Employment, Etc. v. WHDH Corp.*, 580 F.2d 9, 12 n.11 (1st Cir. 1978), *cert. denied*, 440 U.S. 945 (1979). The present case, by contrast, involves "access to the public media . . . for the purpose of influencing political decisions of the general electorate." *Id.* at 12. The government in *Whitten* was acting as a consumer. Here, it is not.

### 2. "Sham" Exception

■ To the extent that Green Mountain argues that Fifth Estate is not entitled to *Noerr-Pennington* immunity because of the "sham" exception to this doctrine, we disagree. The *Noerr-Pennington* doctrine withholds immunity from "sham" activities, which although "ostensibly directed toward influencing governmental action, [are] a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 56 (1993) (quotation and ellipsis omitted). The "sham" exception applies when a party's resort to governmental process is both objectively baseless and subjectively intended only to burden a rival with the governmental decision-making process itself. *See id.* at 60-61; *see also Davric Maine Corp.*, 216 F.3d at 147. Subjective intent, alone, is insufficient to establish the "sham" exception. *Professional Real Estate Investors*, 508 U.S. at 60. Thus, a defendant is entitled to *Noerr-Pennington* immunity even if it pressured or lied to government officials, as long as its conduct was part of a good faith campaign aimed at securing government action. *Doron Precision Systems*, 423 F. Supp. 2d at 189.

■ This exception is unavailable here. A successful effort, such as Fifth Estate's campaign to defeat the warrant articles, "certainly cannot be characterized as a sham." *Allied Tube & Conduit Corp.*, 486 U.S. at 502; *see Davric Maine Corp.*, 216 F.3d at 148. Moreover, the exception only "encompasses situations in which persons use the governmental *process* — as opposed to the *outcome* of that process — as an anticompetitive weapon." *Omni Outdoor Advertising, Inc.*, 499 U.S. at 380. "In this case, it is apparent that the defendants sought to benefit from the *outcomes* of the process at issue," *Davric Maine Corp.*, 216 F.3d at 148, the defeat of the warrant articles.

*III. Conclusion*

To summarize, we hold that the *Noerr-Pennington* doctrine applies to claims brought under the CPA and that Fifth Estate is entitled to immunity under that doctrine for its actions. Accordingly, we conclude that the trial court erred when, in denying Fifth Estate's summary judgment motion and motions for directed verdict and JNOV, it ruled that the CPA applied to Fifth Estate's conduct.

*Reversed.*

DUGGAN and CONBOY, JJ., concurred.